[No. C067054. Third Dist. Aug. 8, 2012.]

MAXIM CRANE WORKS, L.P., Cross-complainant and Appellant, v. TILBURY CONSTRUCTORS, Cross-defendant and Respondent.

---

**COUNSEL**

Jones & Dyer and Gregory F. Dyer for Cross-complainant and Appellant.

Boornazian, Jensen & Garthe, Gregory J. Rockwell and Robert B. Lueck for Cross-defendant and Respondent.

---

**OPINION**

**DUARTE, J.**—Appellant Maxim Crane Works, L.P. (Maxim), was hoist by its own petard when the trial court enforced an unfavorable choice-of-law provision in a form contract written by Maxim.

Steven Gorski, not a party to this appeal, sued Maxim for personal injuries arising from a worksite incident. Maxim cross-complained against Tilbury Constructors (Tilbury), Gorski's employer, seeking indemnity. After a court trial, the trial court found the indemnity agreement was inapplicable to Gorski's claim under Pennsylvania law, the law that Maxim's form contract with Tilbury specified should govern their agreement. The trial court later

awarded Tilbury its attorney fees in full, without apportioning them between defending against the indemnity contract and defending against Gorski's underlying claim.

On appeal, Maxim contends the trial court should not have applied Pennsylvania law to this dispute, and also challenges the award of attorney fees. We shall affirm.

## BACKGROUND

■ Generally speaking, a worker injured on the job is limited to the workers' compensation remedy *against the employer*. (See *Angelotti v. The Walt Disney Co.* (2011) 192 Cal.App.4th 1394, 1403 [121 Cal.Rptr.3d 863].) However, a worker may file a civil tort suit against a third party tortfeasor. (Lab. Code, § 3852; see *Campbell v. Harris-Seybold Press Co.* (1977) 73 Cal.App.3d 786, 790–791 [141 Cal.Rptr. 55].)

On November 27, 2006, Gorski was injured while working for Tilbury at a construction site in Stockton. Maxim had provided Tilbury a crane and operator pursuant to a contract signed that day. The contract was a Maxim form providing that Pennsylvania law "shall govern" the contract. Gorski sued Maxim, alleging the crane was negligently operated. Maxim cross-complained against Tilbury for breach of contract and indemnity, and in part alleged Tilbury had a duty to defend Maxim, and that Tilbury had been negligent.

Gorski received a $900,000 settlement from Maxim after dismissing his wife's loss of consortium claim. This left the cross-complaint to be tried to the court.

Maxim initially contended that Pennsylvania law applied. Tilbury's counsel then unearthed a Pennsylvania statute providing that an injured worker's employer has no liability to a third party tortfeasor, unless such liability is provided by a written contract entered into *prior to the date* of the worker's injury. Tilbury argued that because it signed Maxim's contract the day Gorski was injured, not the *prior* day, the indemnity contract was unenforceable.[1]

Maxim then argued the choice-of-law provision was unenforceable on the facts of this case..

---

[1] The parties do not dispute this interpretation of Pennsylvania law. (77 Pa. Cons. Stat. § 481(b) [no liability to third party absent contract signed "prior to the date" of the injury]; see *McMaster v. Amquip Corp.* (1989) 2 Pa.D.&C.4th 153, 155–156 [indemnity agreement signed day of injury, no liability]; *Pendrak v. Keystone Shipping Co.* (1982) 300 Pa.Super. 393, 396–397 [446 A.2d 912, 913–914] [same]; *Fulgham v. Daniel J. Keating Co.* (2003) 285 F.Supp.2d 525, 536.) Under California law, a similar indemnity agreement is effective if signed "prior to the injury." (Lab. Code, § 3864.)

The trial court rejected Maxim's position, as follows: "While the result might appear on first blush to be harsh in application . . . reflection on the facts that MAXIM (not TILBURY) drafted the contract, MAXIM (not TILBURY) chose to make Pennsylvania law applicable, and certainly MAXIM could have insisted on getting a signed contract in place the day before the work began, all weigh against the Court finding that California public policy considerations should be . . . a reason to deny the application of Pennsylvania law to . . . MAXIM's Cross-Complaint."

Tilbury later moved for attorney fees as the prevailing party, predicated on Maxim's contract, which contained a fee agreement. (See Civ. Code, § 1717 (section 1717).)

Maxim contends some of the fees should be disallowed, because they were incurred solely to defend against Gorski's complaint, not against Maxim's cross-complaint. The trial court concluded the issues were "inextricably intertwined" and granted Tilbury's motion for attorney fees in full.

Maxim filed timely notices of appeal from the judgment and the attorney fee award.

## DISCUSSION

### I

### *Choice of Law*

Touting California's strong public policy to ensure California workers are compensated for injuries occurring in California, Maxim asserts the trial court should have rejected the choice-of-law provision in the contract. We disagree.

Generally speaking: "The basic policy in the field of contracts is protection of the justified expectations of the parties. Parties will generally enter into a contract with the expectation that the provisions of the contract will be binding on them. These expectations 'should not be disappointed by application of the local law rule of a state which would strike down the contract or a provision thereof unless the value of protecting the expectations of the parties is substantially outweighed in the particular case by the interest of the state with the invalidating rule in having this rule applied.' " (1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 65, p. 109.)

Indemnity agreements are common in construction work, and "subject to public policy and established rules of contract interpretation, the parties have great freedom to allocate such responsibilities as they see fit."

(*Crawford v. Weather Shield Mfg., Inc.* (2008) 44 Cal.4th 541, 551 [79 Cal.Rptr.3d 721, 187 P.3d 424] (*Crawford*).) They may require a promisor to indemnify and defend the promisee whether or not the promisor was negligent.[2] (44 Cal.4th at p. 551.)

■ We agree with Maxim that a choice-of-law provision, although generally enforceable, may be unenforceable if it violates a strong public policy in California, the forum state. As stated by the California Supreme Court: ■ " 'The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either [¶] (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties choice, or [¶] (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, [otherwise], would be the state of the applicable law in the absence of an effective choice of law by the parties.' " (*Nedlloyd Lines B.V. v. Superior Court* (1992) 3 Cal.4th 459, 465 [11 Cal.Rptr.2d 330, 834 P.2d 1148] (*Nedlloyd*), quoting with approval Rest.2d Conf. of Laws (1971) § 187(2).)

Maxim is a Pennsylvania company. That fact makes Pennsylvania law initially reasonable under the *Nedlloyd* (and Rest.) test, and Maxim concedes the point. (See *Application Group, Inc. v. Hunter Group, Inc.* (1998) 61 Cal.App.4th 881, 899 [72 Cal.Rptr.2d 73].)

■ The burden thus shifts to Maxim to demonstrate that some California public policy would be impaired by application of Pennsylvania law to this case: "[I]f the proponent of the clause . . . demonstrates that the chosen state has a substantial relationship to the parties or their transaction, or that a reasonable basis otherwise exists for the choice of law, the parties' choice generally will be enforced unless the other side can establish both that the chosen law is contrary to a fundamental policy of California and that California has a materially greater interest in the determination of the particular issue." (*Washington Mutual Bank v. Superior Court* (2001) 24 Cal.4th 906, 917 [103 Cal.Rptr.2d 320, 15 P.3d 1071]; see *1-800-Got Junk? LLC v. Superior Court* (2010) 189 Cal.App.4th 500, 515 [116 Cal.Rptr.3d 923] (*Got Junk?*).)

■ Maxim rests its case on the policy behind the workers' compensation system. We agree California has a strong policy ensuring that injured

---

[2] But in California, a promisor in a construction contract "could not validly agree to indemnify the promisee for the latter's *sole* negligence or willful misconduct." (*Crawford, supra,* 44 Cal.4th at p. 552; see Civ. Code, § 2782, subd. (a).)

California workers are fairly compensated. As stated by the California Supreme Court: ". . . California maintains a stronger interest in applying its own law to an issue involving the right of an injured Californian to benefits under California's compulsory [workers'] compensation act than to an issue involving torts or contracts in which the parties' rights and liabilities are not governed by a protective legislative scheme that imposes obligations on the basis of a statutorily defined status. Its interest devolves both from the possibility of economic burden upon the state resulting from non-coverage of the [worker] during the period of incapacitation, as well as from the contingency that the family of the [worker] might require relief in the absence of compensation. The California statute, fashioned by the Legislature in its knowledge of the needs of its constituency, structures the appropriate measures to avoid these possibilities. Even if the employee may be able to obtain benefits under another state's compensation laws, California retains its interest in insuring the maximum application of this protection afforded by the California Legislature." (*Travelers Ins. Co. v. Workers' Comp. Appeals Bd.* (1967) 68 Cal.2d 7, 12–13 [64 Cal.Rptr. 440, 434 P.2d 992], fns. omitted.)

■ But, as the trial court stated, such public policy has *nothing* to do with this case. Gorski has been compensated. Maxim has cited no authority showing that California has a fundamental policy regarding which of two purses must be opened to compensate an injured Californian. (Cf. *Pacific E. I. Co. v. Industrial Acc. Com.* (1938) 10 Cal.2d 567 [75 P.2d 1058] [applying Cal. compensation law to aid employee injured here, notwithstanding that another law would otherwise apply]; *Alaska Packers Assn. v. Indus. Acc. Com.* (1934) 1 Cal.2d 250 [34 P.2d 716] [same].) Gorski's suit against Maxim was not governed by the California workers' compensation scheme.[3] *Maxim* cannot rely on that scheme's protections.

Maxim relies on *Dailey v. Dallas Carriers Corp.* (1996) 43 Cal.App.4th 720 [51 Cal.Rptr.2d 48] (*Dailey*) for the proposition that California's interest "extends beyond the law's impact on the worker (or survivors) covered by the Workers' Compensation regime." *Dailey* found California had a policy in favor of *employers*, who were entitled to recoup compensation benefits out of the worker's recovery in a third party suit. (*Dailey, supra,* 43 Cal.App.4th at pp. 725–726.) Thus, while Maxim is correct that *Dailey* recognized California's compensation system includes policies beyond those protecting workers, *Dailey* did not hold or imply that in every case involving an injured California worker, every aspect of California law must apply to every party. The policy discussed in *Dailey* was effectuated here by Tilbury's lien on Gorski's tort recovery. (See fn. 3, *ante.*)

---

[3] However, Gorski *also* filed a workers' compensation claim and received a substantial award, leading Tilbury's insurance carrier to file a lien on his tort recovery.

In *Got Junk?, supra*, 189 Cal.App.4th 500, the plaintiff sued on a contract drafted by the defendant, and the defendant was trying to avoid the choice-of-law provision it had drafted, "an anomalous case" as the court put it. (*Got Junk?, supra*, at p. 504, fn. 2.) The issue was whether a California law protecting franchisees from summary termination should apply, and the chosen law, that of Washington State, gave the franchisee *greater* protection in this regard. The court found the California policy protecting franchisees was not impaired: "The instant franchise agreement, giving the franchisee superior protection from summary termination pursuant to Washington law, is not a waiver of compliance with [California law]. California public policy is not offended if the franchisor contractually obligates itself to give notice and an opportunity to cure in situations where [California law] would permit immediate termination of a franchise. *In other words, the public policy of this state is not offended by a franchise agreement giving a franchisee superior protection from summary termination under the chosen law of another state.* Therefore, enforcement of the instant choice of law provision is not barred . . . ." (*Got Junk?, supra*, 189 Cal.App.4th at p. 518, original italics.)

Similarly, here, no California public policy is offended by the fact that Maxim's contract gave Maxim *less* protection, by virtue of Maxim's choice of Pennsylvania law and Maxim's choice to deliver the crane the same day the contract was signed.

As the trial court found, Maxim, the drafter, was in the best position to avoid this result.[4] (See Civ. Code, § 1654; *Mills v. Hunter* (1951) 103 Cal.App.2d 352, 357–358 [229 P.2d 456] ["We are well aware of the rule that printed contracts must be interpreted most strongly against the party preparing the form . . . ."].) As a Pennsylvania company, Maxim is presumed to know Pennsylvania law. (See 31A C.J.S. (2008) Evidence, § 228, p. 282 [parties "presumed to know the general public laws of the state or country where they reside, and the legal effect of their acts"].) The relevant Pennsylvania statute and cases interpreting it long predated the contract. (See fn. 1, *ante.*)

Maxim could have avoided its plight by including a provision making the indemnity agreement valid immediately, notwithstanding Pennsylvania law. (See 11 Williston on Contracts (4th ed. 1999) Interpretation and Construction, § 30:19, pp. 202–203 ["parties to a contract who are not otherwise subject to

---

[4] Maxim contends the rule about construing a contract against the drafter applies only when the contract is ambiguous. But, as Tilbury points out, the trial court merely observed that Maxim chose Pennsylvania law in its contract and therefore could have avoided its current plight; the trial court did not purport to interpret a contractual ambiguity. As stated, Pennsylvania law is well settled on how Maxim's contract must be interpreted on these facts. (See fn. 1, *ante.*)

a statute may choose to incorporate parts of the statute to define their relationship without bringing the full force of the statute to bear"].) Alternatively, Maxim could have insisted that Tilbury sign the contract the day before Maxim delivered or began operation of Maxim's crane.[5]

In short, like the trial court, we cannot see how the result—denying Maxim recovery based on Maxim's contract and conduct—implicates any fundamental California public policy.[6]

## II

### *Attorney Fee Award*

Maxim contends the trial court should have denied most of Tilbury's claimed attorney fees. Maxim contends that Tilbury's expenses in preparing to defend against Gorski's tort suit are not recoverable, only Tilbury's expenses directly related to Maxim's claim for indemnity. We find no error.

### A. *Background*

Maxim's contract states in part Tilbury shall pay "Maxim's costs and expenses, including reasonable attorneys fees (unless prohibited by law), incurred in enforcing this agreement and/or collecting any amounts hereunder." Maxim concedes section 1717 makes this provision reciprocal, although it contests another provision we need not discuss. We agree *this* provision is reciprocal.[7] (See *International Billing Services, Inc. v. Emigh* (2000) 84 Cal.App.4th 1175, 1183 [101 Cal.Rptr.2d 532].)

---

[5] Other courts have rejected attempts by parties to avoid choice-of-law provisions in their own form contracts when their chosen laws prove adverse in a given case. (See *General Electric Credit Corp. v. Beyerlein* (N.Y.Sup.Ct. 1967) 55 Misc.2d 724, 727 [286 N.Y.S.2d 351, 354] ["Bowl-Mor chose to require that the lease be interpreted in accordance with Massachusetts law and I conclude that under the law of Massachusetts the clause relieving the assignee from responsibility for Bowl-Mor's obligations is unenforceable."]; *Atlas Subsidiaries of Florida, Inc. v. O. & O. Inc.* (Fla.Dist.Ct.App. 1964) 166 So.2d 458, 461 [lender sought to apply Pa. law, but "the promissory note in suit specifically provides that it is to be construed according to the laws of Florida" and thus Fla.'s usury laws applied].)

[6] Maxim contends that under Pennsylvania law, its contract would be "harmonized" to invalidate the choice-of-law provision, and that this issue can be raised for the first time on appeal. Its theory is that the contract shows the crane would only be used one day, which is somehow "repugnant" to the choice-of-law clause. But even if the crane were to be used for one day, Maxim could have insisted that the contract be signed the day *before* delivery, therefore we reject the belated claim.

[7] At oral argument, counsel for Maxim argued it was inconsistent to apply Pennsylvania law to invalidate the indemnity agreement, but apply California law (§ 1717) to make the fee provision in that same agreement reciprocal. However, this contention was not separately headed and argued in the opening brief, and therefore we decline to consider it. (See *Stevenson v. Baum* (1998) 65 Cal.App.4th 159, 167, fn. 8 [75 Cal.Rptr.2d 904]; *Utz v. Aureguy* (1952) 109

Tilbury's fee motion was accompanied by detailed billing statements and declarations attesting to the reasonableness thereof, and sought $161,669.87.[8]

In relevant part, Tilbury's counsel declared:

"Defense of Tilbury inherently required counsel for Tilbury to participate actively in the investigation of the underlying facts of the personal injury suit. Under California law, the existence and extent of any indemnification obligation hinged in part on the existence and extent of any negligence on the part of Tilbury in causing Mr. Gorski's accident. Furthermore, Maxim had an interest, as a lone defendant, in uncovering evidence that would suggest other persons, including Tilbury, were responsible for Mr. Gorski's injuries.

"Furthermore, all parties had an interest in investigating Mr. and Mrs. Gorski's damages. Mr. Gorski, although suffering an initially straightforward injury, claimed to have continued ongoing problems with his legs, back and shoulders which he attributed to the injury. Thus the factual investigation involved investigating his ongoing care, which involved deposing his many prior and new treating physicians and reviewing large number of medical records from a variety of care providers. Additionally, other discovery, such as sub rosa surveillance, was reasonably called for by the conflicting medical evidence . . . . [¶] . . . [¶]

". . . The defense of the indemnity cross-complaint inherently involved defense and investigation of the underlying facts and circumstances of the personal injury suit. The issues of Tilbury's and Maxim's alleged negligence, causation, and damages were highly relevant to Tilbury's defenses to Maxim's indemnification claims, and indeed were inextricably intertwined."

In opposition, Maxim asserted that work on the indemnity issue was "easily" distinguishable from work on defending Gorski's claim. Maxim argued the indemnity provision would have applied regardless of any finding of *Maxim's* negligence, "Thus, Tilbury's argument that it had to investigate the personal injury cause of action to defend against the cross-complaint for indemnification is without merit."

Maxim's counsel's declaration set forth a list of particular billing entries from Tilbury's special counsel's declaration, opined they were for work

---

Cal.App.2d 803, 807–808 [241 P.2d 639].) Moreover, Maxim's briefing conceded that the relevant fee provision was "made mutual by Civil Code 1717."

[8] Tilbury had general attorney work done by Downey Brand, and an attorney from that firm oversaw the special counsel hired for this case. Downey Brand's bill was $7,274.50, and special counsel's bill was $154,395.37.

unrelated to the indemnity claim, and suggested an award of $50,263 for work on the indemnity action, plus $2,400.58 for Tilbury's general counsel, for a total of $52,663.58.[9]

Maxim's opposition argued that billings for depositions of medical care providers, consultations with medical experts, surveillance, and deposition of "medical and construction-related experts" should be disallowed. The opposition also stated that Tilbury's counsel's detailed billings "clearly" stated which items pertained to indemnity and which pertained to tort liability. But Maxim's counsel's *supporting declaration* was vague. It stated Maxim's counsel had prepared "a true and correct copy of summary of dates and billing amounts . . . that can reasonably be related to the defense of the indemnity action." What Maxim's counsel referred to was a spreadsheet that listed various dates and hours spent. But neither Maxim's spreadsheet nor counsel's declaration explained why *specific* entries claimed by Tilbury's special counsel should be disallowed; counsel simply asserted that the items listed on the spreadsheet were proper.

Tilbury's reply in part noted that Maxim's cross-complaint alleged Tilbury had been negligent, and highlighted the conclusory nature of Maxim's counsel's declaration, stating that even if Maxim's claim for apportionment of fees was proper, "Maxim's failure to explain how it interpreted and applied its vaguely described methodology for reducing Tilbury's fee request, prevents Tilbury, and the Court, from evaluating whether Maxim has correctly applied it. Maxim appears to expect the Court to simply accept its word that its assessment of Tilbury's time is correct."

The trial court accepted Tilbury's contention that defense against Maxim's indemnity cross-complaint was "inextricably intertwined" with Tilbury's defense against Gorski's tort suit, and awarded the claimed fees *in full*.

### B. *Analysis*

Our scope of review of an attorney fee award is narrow: "Once a trial court determines entitlement to an award of attorney fees, apportionment of that award rests within the court's sound discretion. [Citations.] We review the court's decisions for abuse of discretion. [Citation.] The court abuses its discretion whenever it exceeds the bounds of reason, all of the circumstances before it being considered. The burden is on the party complaining to establish that discretion was clearly abused and a miscarriage of justice

---

[9] Maxim asserted it could not parse Downey Brand's billings with accuracy because they were too general as to tasks performed, but suggested a two-thirds reduction was appropriate. Tilbury disputed whether Downey Brand's billings were too general, but the point is not significant on appeal.

resulted." (*Carver v. Chevron U.S.A., Inc.* (2004) 119 Cal.App.4th 498, 505 [14 Cal.Rptr.3d 467]; see *Thompson Pacific Construction, Inc. v. City of Sunnyvale* (2007) 155 Cal.App.4th 525, 556 [66 Cal.Rptr.3d 175] ["The trial court . . . was in the best position to determine whether any further allocation of attorney fees was required or whether the issues were so intertwined that allocation would be impossible."].)

■ The California Supreme Court has stated that, "Attorney's fees need not be apportioned when incurred for representation on an issue common to both a cause of action in which fees are proper and one in which they are not allowed." (*Reynolds Metals Co. v. Alperson* (1979) 25 Cal.3d 124, 129–130 [158 Cal.Rptr. 1, 599 P.2d 83]; see *Abdallah v. United Savings Bank* (1996) 43 Cal.App.4th 1101, 1111 [51 Cal.Rptr.2d 286].)

Further, "Apportionment is not required when the claims for relief are so intertwined that it would be impracticable, if not impossible, to separate the attorney's time into compensable and noncompensable units." (*Bell v. Vista Unified School Dist.* (2000) 82 Cal.App.4th 672, 687 [98 Cal.Rptr.2d 263]; see *Drouin v. Fleetwood Enterprises* (1985) 163 Cal.App.3d 486, 493 [209 Cal.Rptr. 623] ["Attorneys fees need not be apportioned between distinct causes of action where plaintiff's various claims involve a common core of facts or are based on related legal theories."].)

Tilbury contends, "By virtue of Maxim's own cross-complaint, Tilbury had an interest in lessening its potential exposure on the contractual indemnity allegations, by trying to reduce Mr. Gorski's injuries and damages . . . ." Tilbury also contends that once Gorski and Maxim settled, Maxim still had to show the amount of the settlement was fair, before recouping that amount from Tilbury. In short, "Maxim's own cross-complaint intertwines the subjects of liability" to Gorski with the claim for defense and indemnification.

■ The general rule is that where an indemnitee has *settled* a claim after an indemnitor has declined to defend—as opposed to suffering an adverse *judgment*—the settlement amount is *not* conclusive on the question of what amount the indemnitor must pay the indemnitee, it is merely presumptive evidence of the amount. (See *Peter Culley & Associates v. Superior Court* (1992) 10 Cal.App.4th 1484, 1495–1497 [13 Cal.Rptr.2d 624] (*Peter Culley*), cited with approval in *Crawford, supra,* 44 Cal.4th at p. 554, fn. 6.)[10] The indemnitor may try to show "the settlement was unreasonable." (*Peter Culley, supra,* 10 Cal.App.4th at p. 1498.)

---

[10] Tilbury cites Pennsylvania authority for this proposition, but Maxim does not contend California law differs.

To the extent Tilbury's counsel spent time to show Gorski was inflating his injury claims, that time was also spent defending against Maxim's indemnity claim, because it could tend to show Maxim's settlement with Gorski was unreasonable.

*Baldwin Builders v. Coast Plastering Corp.* (2005) 125 Cal.App.4th 1339 [24 Cal.Rptr.3d 9] (*Baldwin Builders*), relied on by Maxim, is not to the contrary. There, indemnitors had to prove their own lack of fault to avoid liability, and the court allowed them to recover the fees necessary to make that showing. (*Baldwin Builders, supra*, 125 Cal.App.4th at pp. 1347–1348.) *Baldwin Builders* also observed that some fees—not otherwise described— were "unrelated" to such showing, and the matter was remanded for consideration of apportionment. (*Baldwin Builders, supra*, at p. 1348.) But *Baldwin Builders* does not support the broad proposition that an indemnitor can never recover the costs of defending the underlying suit.

*Erickson v. R.E.M. Concepts, Inc.* (2005) 126 Cal.App.4th 1073 [25 Cal.Rptr.3d 39] (*Erickson*), also cited by Maxim, is factually inapposite. There, R.E.M., a construction subcontractor, was sued by homeowners for defective windows. The homeowners had settled with the developer and general contractor, who had cross-complained against R.E.M. and who had assigned their indemnity claims against R.E.M. to the homeowners. (*Erickson, supra*, 126 Cal.App.4th at pp. 1076–1077.) As in *Baldwin Builders*, the relevant indemnity agreement was not triggered unless R.E.M. was found liable for negligence. (*Erickson, supra*, at pp. 1077, 1082.) After R.E.M. prevailed, the trial court awarded it attorney fees, without significant apportionment between defense of the indemnity claim and the negligence claim, *in part* because the indemnity claim itself would not have been triggered unless R.E.M. had been negligent. (*Id.* at pp. 1082–1083, 1084–1086.) However, *Erickson* also pointed out that "with respect to the amount of indemnity Erickson might be entitled to recover, Erickson needed to prove the reasonableness of allocated sums . . ." received via settlement. (*Id.* at p. 1084; see *Peter Culley, supra*, 10 Cal.App.4th at p. 1498.) Thus, *Erickson*, properly read, cuts against Maxim, because it reiterates the rule that where issues of indemnity and liability overlap, apportionment is not required, and applies that same rule in a case similar to the instant case, where defense against the indemnity claim included challenging the reasonableness of the underlying settlement.

Here, although the indemnity contract did not turn on Tilbury's negligence, Tilbury was defending in part by trying to show Gorski's claims were inflated. Had Tilbury lost on the choice-of-law claim (see pt. I, *ante*) it still

could have attacked Gorski's settlement as unreasonable and thereby minimized its liability to Maxim on the indemnity agreement.[11]

Given Maxim's pleadings and the fact Tilbury's costs incurred opposing Gorski's underlying tort claims would also aid Tilbury in partially avoiding liability even had Maxim prevailed in enforcing the indemnity contract, we find no abuse of discretion by the trial court in concluding the issues were "inextricably intertwined" and declining to lessen Tilbury's claimed fees by apportioning them as requested by Maxim.

## DISPOSITION

The judgment is affirmed. Maxim shall pay Tilbury's costs of this appeal. (Cal. Rules of Court, rule 8.278.)

Nicholson, Acting P. J., and Butz, J., concurred.

---

[11] We do not mean to imply the settlement *was* unreasonable. We merely point out that it was rational for Tilbury's counsel to incur fees in an effort to limit Tilbury's exposure.