Filed 3/13/13  Glenn v. Eull CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| WILLIAM V. GLENN, JR., et al.,<br><br>　　　Plaintiffs and Respondents,<br><br>　v.<br><br>CLINTON B. EULL, III,<br><br>　　　Defendant and Appellant. | B239211<br><br>(Los Angeles County<br>Super. Ct. No. YC062020) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Stuart M. Rice, Judge.  Affirmed.

Law Offices of Mark C. Fields, Mark C. Fields for Defendant and Appellant.

Cohen & Lord, Bruce M. Cohen, Jonathan F. Golding, Rae Lamothe for Plaintiffs and Respondents.

—————————

Defendant Clinton Eull appeals the judgment entered against him which found that he had wrongfully disparaged the title to the real property of plaintiffs William and Roxanne Glenn. Finding no error, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

In early 2010, the Glenns entered escrow with Dan and Janet Beck to purchase the real property located at 5617 Via del Collado in Torrance. The transaction was scheduled to close escrow on March 31, 2010.

On March 17 and 18, 2010, Mr. Eull, who lived next door to, and uphill from, the Becks at 5615 Via del Collado, delivered to the Becks two letters[1] claiming that his property was currently sustaining damage on account of flooding and vibrations emanating from the Becks' property, and demanding $718,000 in compensation. In response to the letters, the Glenns sought to inspect the damage to the Eull property. Mr. Eull refused to permit an inspection. The Glenns therefore filed a complaint seeking declaratory relief and requesting an order to inspect the Eull property, which the court issued.

As a result of Mr. Eull's claim, the close of the Beck/Glenn escrow was delayed until May 4, 2010. The Becks leased the residence to the Glenns during the month of April at a rental of $10,000.

The Glenns retained geological and soils experts to inspect the Eull property pursuant to the court order. Those experts found no flooding, no underground vibrations, and no damage to the property. Although Mr. Eull later acknowledged that, by the end of March, there was no continuing vibration or flooding issue, he refused to recant his

---

[1] The first letter read in full: "Water from your property is flooding the northwest section of my property located at 5615 Via del Collado causing damage. [¶] This is a demand for payment of $718,000 for the damages." The second letter stated: "In addition to the flooding problem, there are underground vibrations coming from the east side of your property and affecting my property at 5615 Via del Collado, causing what may amount to additional damages. [¶] In case you failed to receive my letter dated March 17, 2010, this is a demand for payment of $718,000 for the damages."

claim. Consequently, the Glenns amended their complaint to state causes of action for intentional interference with contract and disparagement of title, and sought both compensatory and punitive damages.

Trial was to the court, which found in favor of the Glenns on all causes of action. The court awarded the Glenns $10,000 in compensatory damages for the interference with contract claim, and $200,000 in attorney fees as compensatory damages and $50,000 in general damages, for the disparagement of title cause of action. The court also found, however, that the Glenns had failed to establish the requisites for an award of punitive damages, and refused to award the Glenns any damages for emotional distress. The court entered judgment for $281,862.50, plus costs of suit.

Mr. Eull timely appealed the judgment.


CONTENTIONS

Mr. Eull advances four arguments on this appeal. First, he claims that the lawsuit is barred by the litigation privilege. Second, he maintains that the award of $50,000 in general damages is without legal or evidentiary support. Third, he contends that irregularities in the proceedings before the trial court require a new trial. And lastly, he argues that the trial court erred in awarding $200,000 in attorney fees.[2] We consider each contention in turn.


STANDARD OF REVIEW

The parties agree that the standard of review applicable to this appeal is the substantial evidence test. Thus, we review the record in the light most favorable to the prevailing party to determine whether there is substantial evidence to support the conclusions of the factfinder. "'Substantial evidence' is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value. [Citations.]

---

[2] Mr. Eull did not argue, either at trial or on this appeal, that the Glenns' purchase of the property at the price negotiated before Mr. Eull created the "cloud" on title negated any supposed damages flowing from the disparagement of title.

3

'Substantial evidence . . . is not synonymous with "any" evidence.' Instead, it is "'substantial' proof of the essentials which the law requires."' [Citations.] The focus is on the quality, rather than the quantity, of the evidence. . . . [¶] The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record. (*Kuhn v. Department of General Services* [(1994)] 22 Cal.App.4th 1627, 1633.)" (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651-652.)

## DISCUSSION

### 1. *Litigation privilege*

"For well over a century, communications with 'some relation' to judicial proceedings have been absolutely immune from tort liability by the privilege codified as section 47(b)."[3] (*Rubin v. Green* (1993) 4 Cal.4th 1187, 1193-1194, citations omitted.) "Undergirding the immunity conferred by section 47(b) is the broadly applicable policy of assuring litigants 'the utmost freedom of access to the courts to secure and defend their rights . . . .' (*Albertson v. Raboff* [(1956)] 46 Cal.2d [375,] 380.)" (*Rubin v. Green, supra,* 4 Cal.4th at p. 1194.) The privilege applies not only to pending actions, but to anticipated lawsuits. (*Ibid.*; see also *Block v. Sacramento Clinical Labs, Inc.* (1982) 131 Cal.App.3d 386, 393.) However, "the mere potential or 'bare possibility' that judicial proceedings 'might be instituted' in the future is insufficient to invoke the litigation privilege. (Rest.2d Torts, §§ 586-588, com. e, pp. 247-251.) In every case, the privileged communication must have some relation to an imminent lawsuit or judicial proceeding which is *actually* contemplated seriously and in good faith to resolve a dispute, and not simply as a tactical ploy to negotiate a bargain." (*Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 36, citing *Silberg v. Anderson* (1990) 50 Cal.3d 205, 212-214, 218.) "[T]he privilege attaches at that point in time that imminent access to the courts is

---

[3] "A privileged publication or broadcast is one made: [¶] . . . [¶] (b) In any (1) legislative proceeding, (2) judicial proceeding, (3) in any other official proceeding authorized by law, or (4) in the initiation or course of any other proceeding authorized by law . . . ." (Civ. Code, § 47.)

4

seriously proposed by a party in good faith for the purpose of resolving a dispute, and not when a threat of litigation is made merely as a means of obtaining a settlement." (*Edwards v. Centex Real Estate Corp., supra,* 53 Cal.App.4th at p. 36.)

Mr. Eull maintains that his letters to his neighbor demanding payment of $718,000 for flooding and vibrations affecting his property were prelitigation demand letters sent in good faith and in serious consideration of a possible litigation. The trial court ruled that the litigation privilege did not apply to these communications, finding that the letters were sent to induce an unwarranted payoff from Mr. Beck or his realtor out of the pending escrow. We therefore review the record to determine whether substantial evidence supports the trial court's conclusion that the letters were not sent in good faith and in serious consideration of litigation.

We conclude that substantial evidence supports the finding. First, the record is devoid of evidence that the Beck's property was flooding the Eull property. Because the Beck property was downhill from the Eull property, surface flooding was a physical impossibility. In addition, Mr. Eull never asked Mr. Beck to repair the damage to his property, had no basis to demand $718,000 in "damages," had not consulted a soils expert to assess damage to the property or a contractor to obtain a repair estimate, had not contacted an attorney to learn what legal recourse was available to him, and had refused to permit the Glenns to inspect the property to assess the damage claim (requiring them to file this lawsuit to gain access to the property). Moreover, as a professional real estate investor and a former real estate broker, Mr. Eull knew that his letters would interfere with the pending escrow; indeed, as he testified at trial, this was his stated purpose in sending them: "[I]n a perfect world, people will pay for stuff to get me to close [escrow]." Based on the foregoing evidence, the trial court concluded that Mr. Eull's "two letters to Mr. Beck [which he] deposited into escrow were designed to interfere with the Becks' contract to sell the property and to attempt to receive financial remuneration or other financial benefit from Beck."

While Mr. Eull insists that he "had a good faith belief that the problems he observed on the Eull Residence were the fault of Mr. Beck," the trial court was not

5

required to credit that testimony. The court's conclusion that the demand letters were sent not in serious contemplation of litigation, but in an attempt to extract money to which Mr. Eull was not entitled from the parties to a real estate transaction, was based on substantial evidence, including its assessment of Mr. Eull's credibility. Thus, the litigation privilege does not bar this lawsuit.

2. *General damages award*

The trial court awarded the Glenns $50,000 in general damages on their disparagement of title cause of action. As the trial court noted, these damages were awarded "not for emotional distress, which are prohibited, but for time and inconvenience spent in attempting to take the actions necessary to clear the cloud on the title." Mr. Eull maintains that there is no legal basis for this award.

"In an action for wrongful disparagement of title, a plaintiff may recover (1) the expense of legal proceedings necessary to remove the doubt cast by the disparagement, (2) financial loss resulting from the impairment of vendibility of the property, and (3) general damages for the time and inconvenience suffered by the plaintiff in removing the doubt cast upon the property." (*Seeley v. Seymour* (1987) 190 Cal.App.3d 844, 865, fn. omitted.) It has been acknowledged that arriving at a dollar figure for the inconvenience and time suffered by the plaintiff in removing the cloud on title is not a precise practice, however, "their character is such that the trial judge could call on his general knowledge of their amount. . . . 'One whose wrongful conduct has rendered difficult the ascertainment of the damages cannot escape liability because the damages could not be measured with exactness.'" (*Wright v. Rogers* (1959) 172 Cal.App.2d 349, 366-367, citations omitted.)

Dr. Glenn testified that, during the 68 weeks between the time that Mr. Eull sent the letters and the trial of this action, he spent approximately 20 hours a week attending to this matter. In addition to the time required to address the matter in connection with the close of escrow and to consult with his attorneys in the prosecution of the lawsuit, Dr. Glenn attended all of the depositions. In determining the amount of general damages,

6

the trial court considered the amount of time incurred by the Glenns, the disruption in their personal and professional lives and the $500 an hour rate Dr. Glenn charges as an expert witness. In awarding $50,000 in general damages, the court compensated Dr. Glenn at the rate of $37 an hour for the time he spent removing the doubt cast by the disparagement. Substantial evidence supports the award of general damages.

### 3. *Irregularities in the proceedings*

Mr. Eull cites five "irregularities" in the trial proceedings which he claims cumulatively require a new trial. These include: (1) opposing counsel's reference to Mr. Eull's religious clothing; and the trial court's actions in (2) refusing to permit an opening statement; (3) prohibiting Mr. Eull from calling a material witness in his case in chief; (4) considering settlement discussions and Mr. Eull's refusal to sign a release; and (5) finding unreasonable Mr. Eull's refusal to permit inspection of his property without a court order. We conclude that none of the cited actions constitutes error, and thus there was no cumulative error which requires a new trial.

#### a. *Comments on Mr. Eull's clerical attire*

During his closing argument, the Glenns' counsel stated: "The court could not help but notice that Mr. Eull dressed as a priest during much of this trial. Perhaps the Court also noted that he didn't dress in clerical garb when his wife was in the courtroom. Is that because she had never seen him dressed as a priest? I would venture to guess so. Again, your honor, calculation." Mr. Eull argues that after being shocked and insulted by the accusation that he was pretending to be a priest in order to manipulate the trial court, while hiding his costume when his wife was present, he was required to present his own closing argument. He concludes, "Such conduct should not be condoned, and is egregious enough to justify by itself a new trial." We do not agree.

Counsel's comments regarding Mr. Eull's attire were made in the context of the argument that Mr. Eull's unwarranted demands on the eve of the close of escrow were calculating and manipulative, and supported a claim for punitive damages. The fact that Mr. Eull, a professional real estate investor who was also an ordained minister, wore

clerical garb at the trial of a real estate matter, and that he did so on some occasions but not others, raised questions about the motives for his sartorical choices. (See, e.g., *La Rocca v. Lane* (1975) 37 N.Y.2d 575, 583 [religious attire worn by attorney had potential to sway jurors' view of credibility in an improper manner].) Plaintiffs' counsel offered the conclusions he inferred from these unusual facts—that Mr. Eull was trying to bolster his credibility by presenting himself as a man with a sacred calling. Counsel's remarks were a fair comment on the evidence. Moreover, the trial court observed Mr. Eull's attire throughout the proceedings, and no doubt came to its own conclusions.

### b. *No opening statements permitted*

Mr. Eull complains that the trial court denied him the right to give an opening statement in a trial to the court. He notes that Code of Civil Procedure section 607 provides for opening statements in jury trials, and that section 631.7 of the same code indicates that the same order of trial is to be followed in a bench trial. He concludes that he "should have been allowed to make an opening statement, and it was an irregularity in the proceedings, deviating from express statutory law, for the court to have not afforded this right" to him.

"From their creation by article VI, section 1 of the California Constitution, California courts received broad inherent power 'not confined by or dependent on statutes.' [Citations.] This inherent power includes 'fundamental inherent equity, supervisory, and administrative powers, as well as inherent power to control litigation.' [Citation.]" (*Stephen Slesinger, Inc. v. Walt Disney Co.* (2007) 155 Cal.App.4th 736, 758.) In this case, the trial court expressly determined that opening statements were not necessary, and offered the parties the opportunity to file trial briefs at any time.

The purpose of an opening statement is to "prepare the minds of the jury to follow the evidence and to more readily discern its materiality, force, and effect." (*People v. Green* (1956) 47 Cal.2d 209, 215.) "The purpose of the opening statement is to inform the jury in a general way of the nature of the action and defense, to advise them of the facts relied on by the party to make up his right of action or defense, to define the nature of the questions involved, and advise them of the issues to be tried and the facts intended

8

to be proved, so as to enable them to understand the case to be tried; and the opening statement is not for the purpose of discussing questions of law." (*Williams v. Goodman* (1963) 214 Cal.App.2d 856, 869.) None of these purposes is relevant to a bench trial. Indeed, in this case, the trial court had acted as the parties' settlement judge. In that capacity, the court met on several occasions over three court days with both parties, spoke with them extensively about the lawsuit and decided motions in limine. Consequently, the court was well aware of the nature of the action and defense, the issues to be tried and the facts intended to be proved. Mr. Eull cannot have been prejudiced by his inability to make an unnecessary opening statement.

  *c. Mr. Eull not permitted to call Dr. Glenn in his case-in-chief*

  Mr. Eull complains that "the trial court ruled that Mr. Eull could not call Mr. Beck as a witness in his case in chief," citing as evidence of this ruling the Clerk's Transcript at pages 883 and 884. Those pages of the Clerk's Transcript contain neither a transcription of the judge's ruling from the bench nor a minute order documenting that ruling. Rather, they contain pages 5 and 6 of a declaration Mr. Eull filed in connection with his motion for a new trial. The declaration states that, "[a]fter the conclusion of Mr. Beck's testimony in plaintiffs' case in chief, the court, over my objection, dismissed Mr. Beck as a witness, with the result being that I was not allowed to call him as a witness in my case in chief." This court's review of the Reporter's Transcript of Proceedings reveals no request on the part of Mr. Eull to call Mr. Beck as a witness in his case-in-chief, and no refusal by the trial court to do so. Moreover, the Reporter's Transcript indicates that the trial court excused Mr. Beck as a witness following the testimony he gave on cross-examination by Mr. Eull during the Glenns' case-in-chief. Contrary to Mr. Eull's statement in his declaration, he did not object to the trial court excusing Mr. Beck from the proceedings. In short, there is no evidence that Mr. Eull attempted to call Mr. Beck as a witness during his case-in-chief, much less that such an attempt was thwarted by the trial court. Thus, there is no trial court ruling subject to review on appeal.

9

*d. Court's consideration of settlement discussions*

Mr. Eull asserts that the trial court improperly considered settlement discussions between the parties in reaching its decision. Specifically, after Mr. Eull acknowledged that the flooding and vibrations had ceased at some point in March 2010, the Glenns requested that Mr. Eull sign a recordable covenant (which Mr. Eull refers to as a release) to remove the doubt cast on title by his prior claims of damage and end the litigation. A copy of the proposed release was admitted into evidence as Exhibit 61. In announcing its tentative decision, the trial court stated, "Mr. Eull's assertion that he did not sign any of the contemplated versions of the release[] because the language was overbroad is not accepted by the Court. Defendant Eull never proposed language of his own. The issue was not resolved at any time, which required the Glenns to proceed with this litigation." Citing Evidence Code sections 1152, subdivision (a) and 1154, Mr. Eull maintains that the discussions between the parties regarding a release of claims were privileged settlement negotiations and should not have been considered by the trial court for any purpose. The argument is unavailing.

If a party fails to object to the consideration of evidence which may be covered under the settlement privilege of Evidence Code section 1152, or if a party voluntarily introduces the evidence on his own, the privilege is waived. (*Regents of University of California v. Sumner* (1996) 42 Cal.App.4th 1209, 1213.) Mr. Eull did not object to testimony regarding the efforts of the Glenns to have Mr. Eull withdraw his claims. Neither did Mr. Eull object to testimony of the Glenns attorney, Mr. Cohen, to the effect that Mr. Eull repeatedly stated that he would execute some form of a release, but that none was ever signed. Indeed, Mr. Eull referenced Exhibit 61 in his cross-examination of Mr. Cohen, and discussed the release himself while testifying on direct examination. Thus, Mr. Eull waived the settlement privilege of Evidence Code section 1152.

*e. Court's determination that Mr. Eull's refusal to permit inspection of his property damage was unreasonable*

In announcing its tentative decision in court, the trial court remarked that "Mr. Eull's refusal to allow the Glenns and their representatives and experts to inspect the

10

property without a court order was not reasonable, in light of the surprise allegation which he had raised at the sensitive point of the escrow." Mr. Eull argues: "The impropriety of this finding is grounded in the fact that Mr. Eull had an inalienable right under both the United States Constitution, and the California Constitution, to be protected from any unreasonable search or inspection of his property without due process of law."

The Glenns sued Mr. Eull for slander or disparagement of title. "[S]lander of title is an injury to real property." (*Coley v. Hecker* (1928) 206 Cal. 22, 26.) Slander of title "occurs when a person, without a privilege to do so, publishes a false statement that disparages title to property and causes pecuniary loss. [Citation.]" (*Truck Ins. Exchange v. Bennett* (1997) 53 Cal.App.4th 75, 84.) The false statement must be "maliciously made with the intent to defame." (*Howard v. Schaniel* (1980) 113 Cal.App.3d 256, 263.) Thus, in order to prove their case, the Glenns were required to establish that Mr. Eull's damage claim was not made in good faith.

Among the evidence which the Glenns relied on to prove Mr. Eull's bad faith was the fact that the damage claim was made days before escrow was to close, even though Mr. Eull claimed to have discovered the damage earlier in the year, and that Mr. Eull refused to permit access to the property to substantiate the claim. The court was entitled to infer from this refusal of access that Mr. Eull knew that an inspection of his property would not reveal $718,000 in damages, and that by forcing the Glenns to retain an attorney and go to court to obtain an order permitting them access – a course of conduct which would jeopardize the timely close of escrow – he was attempting to persuade one or more of the participants in the purchase and sale to offer him money so that the escrow could close as scheduled. This argument, and the trial court's acceptance of it, are entirely reasonable. The rights protected by the Fourth Amendment are not implicated in any way.

4. *Award of Attorney Fees*

The evidence introduced at trial established that the Glenns incurred $464,229 in attorney fees and $48,842 in expert fees. The court awarded the Glenns $200,000 in

11

attorney fees and $21,863 in expert fees as damages in removing the cloud on the title to their property. Mr. Eull challenges this award, arguing that because the Glenns' complaint contained four causes of action (two for declaratory relief and one for tortious interference with contract, in addition to the disparagement of title claim) the trial court was required to apportion the attorney fees so that only those fees attributable to the wrongful disparagement claim would be recovered by the Glenns. The argument is without merit.

Regardless of the number of causes of action in the complaint, the Glenns had a single purpose in prosecuting this lawsuit: to remove the cloud that Mr. Eull's unwarranted demands had placed on their title. Indeed, the two causes of action for declaratory relief sought a declaration that "no waters from the Beck Property are flooding and/or causing damage to the Eull Property" and "no vibrations from the Beck Property are causing any damage to the Eull Property." Those two causes of action were not separate and distinct from the disparagement of title claim, but a reiteration of it. "Attorney's fees need not be apportioned when incurred for representation on an issue common to both a cause of action in which fees are proper and one in which they are not allowed." (*Reynolds Metals Co. v. Alperson* (1979) 25 Cal.3d 124, 129-130.) Thus, there was no need to apportion attorney fees among these three causes of action. As the trial court noted, the remaining cause of action for intentional interference with contract was based substantially on the same facts, circumstances and conduct as the other three causes of action. Consequently, the court declined to apportion fees. That ruling is reviewed for an abuse of discretion. (*Maxim Crane Works, L.P. v. Tilbury Constructors* (2012) 208 Cal.App.4th 286, 297-298.) "The court abuses its discretion whenever it exceeds the bounds of reason, all of the circumstances before it being considered." (*Id.* at p. 297.)

12

We conclude that the trial court acted well within its discretion in concluding that the attorney fees incurred by the Glenns were not subject to apportionment.

DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ARMSTRONG, Acting P. J.

We concur:

MOSK, J.

KRIEGLER, J.

13