Filed 2/19/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| CALVO FISHER & JACOB LLP,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>DAVID J. LUJAN,<br><br>        Defendant and Appellant. | A139863<br><br>(San Francisco City & County<br>Super. Ct. No. CGC-10-498299) |

This is the third in a series of appeals filed by appellant David Lujan in this case, the general background of which was described in our introduction in the earlier opinion: "A prominent Guam attorney [Lujan] was sued in two lawsuits in Hawaii, followed by a third lawsuit in California, the last of which, were it to succeed, could have cost the attorney millions of dollars, loss of his reputation, and perhaps his license to practice law. The attorney hired a law firm with offices in San Francisco and Guam to represent him, a representation that quickly came to include the filing of two more proceedings. The representation was vigorous indeed, and quickly generated significant billings about which the attorney came to complain, ultimately refusing to pay a large balance. The firm withdrew from the representation, and sued. Following a lengthy jury trial, the jury returned a verdict for the firm of $945,947.90, the full amount sought. The trial court later awarded $331,545.51 in prejudgment interest." Lujan appealed, and we affirmed both the judgment and the award of prejudgment interest. (*Calvo Clark & Jacob LLP v. Lujan* (July 28, 2014, A138210 & A138610) [nonpub. opn.].)

This appeal involves two issues arising out of two postjudgment filings by the law firm: (1) a memorandum of costs, and (2) a motion for attorney fees based on the engagement letter Lujan had signed with the firm. Following thousands of pages of

1

briefing and extensive oral argument, the trial court filed its order awarding the law firm $1,532,674 in attorney fees, and $123,227 in expert witness fees, based on a Code of Civil Procedure section 998 offer. Lujan appeals that order. We again affirm.

## BACKGROUND

To put the case in perspective, we begin with quotation from our earlier opinion:

**"The Setting: The Parties, the Participants, and the Proceedings**

"Appellant David Lujan is an attorney in Guam, the senior partner in the firm of Lujan, Aguigui & Perez LLP. Lujan is very experienced, having done 'hundreds of trials,' and is apparently well regarded, having represented many high profile people, including governors, lieutenant governors, and other politicians, in Guam and the Commonwealth of the Northern Mariana Islands. But it was his representation of a minor named Junior Larry Hillbroom (Junior) that would lead to the appeal before us here.

"In 1995, Lujan took on the representation of Junior, seeking to prove that Junior was an heir of Larry Hillblom (Hillblom), one of the founders of DHL Worldwide Express, who disappeared while piloting an airplane near Saipan. Lujan's efforts on behalf of Junior were successful, with Junior ultimately receiving some $90 million from Hillblom's estate. Lujan received a contingency fee, apparently of 38 percent.

"The settlement with the estate closed in April 2000, but Lujan's involvement with Junior continued. . . . Keith Waibel was designated as trustee of Junior's trust, with Lujan to serve as a "protector" who oversaw the trustee. Lujan continued on in his role as protector (and perhaps other roles as well) over the course of several years, during which he received substantial sums of money in connection with those services— substantial sums of money that led to Lujan being sued. Specifically:

"In October 2008, two actions were filed in Hawaii, filed by Waibel, as trustee of the JLH Trust and the JLH Pacific Trust (the Hawaii actions). The Hawaii actions essentially sought to recover monies the trustee claimed were owed the trusts by Lujan and his wife. The Hawaii actions were relatively modest in scope, one involving

2

$250,000 or less, the other a dispute with Waibel whether Lujan's monthly fees should be reduced. The next action was far more serious.

"In February 2009, Junior, now having reached the age of majority, filed suit in the United States District Court for the Central District of California, in an action entitled *Junior Larry Hillbroom v. David J. Lujan, Barry J. Israel, and Keith A. Waibel*, case no. CV 09-0841 (the California action). The California action was filed on behalf of Junior by the firm of Girardi Keese, a prominent plaintiff's law firm in southern California, and alleged claims for legal malpractice, breach of fiduciary duty, fraud, civil conspiracy, violations of 18 U.S.C. § 1961 et seq. (RICO), and violations of Business and Professions Code section 17200 et seq. The thrust of the California action was that Lujan conspired with Waibel (Junior's former guardian and the then-current trustee of his trusts) and Barry Israel (Lujan's co-counsel during his representation of Junior as a minor) to fraudulently increase the contingent fee in Junior's recovery from the Hillblom estate from 38 percent to 56 percent. The California action sought to recover millions of dollars, including punitive damages against Lujan.

"It was at this point that Lujan turned to Eduardo Calvo.

"Calvo is a lawyer in Guam, and the senior name partner in the firm of Calvo & Clark, which had offices in Guam and San Francisco.[1] Calvo was well known to Lujan, as Calvo had been involved as an attorney in the Hillbloom probate with whom Lujan had worked closely. And following the close of probate, Calvo had referred significant business to him. As Lujan described it, throughout the years, he and Calvo spent 'hundreds of days and evenings . . . together' and, 'I thought we were friends.' (Fn. omitted.) Thus, and because Calvo had practiced in Hawaii, Lujan decided to retain Calvo to represent him. In short, Calvo and the manner in which he represented his clients were well known to Lujan.

"In February 2009, Calvo & Clark prepared, and Lujan and his wife signed, a letter referenced 'Engagement of Legal Services' (engagement letter). The engagement

---

[1] "Calvo & Clark is now known as Calvo Fisher & Jacob LLP."

3

letter was four pages long, single spaced, and began with confirmation of Calvo & Clark's 'understanding that we will provide you with representation' in the Hawaii and California actions. . . . [¶] . . . [¶]

"Lujan became involved in two more lawsuits after the engagement letter was signed, and the parties agreed that the agreement would also cover these lawsuits. The first of these lawsuits was filed in April 2009, by Calvo & Clark on behalf of Lujan in the Guam Superior Court (the Guam action). The Guam action alleged among other things a claim for defamation against Girardi Keese, based on statements made to the press in Guam concerning Lujan's earlier representation of Junior. The Guam action also asserted claims against Waibel and others, seeking to recoup monies Lujan asserted he was owed by Waibel, Junior, and one of the trusts under the contingency fee agreement.

"The second post-engagement letter proceeding was Calvo & Clark's filing on Lujan's behalf a motion to reopen and unseal the *Guardianship of Junior Larry Hillbroom*, Special Proceeding, Guam Superior court number JP0624-95 (the guardianship action). The guardianship action arose out of Calvo & Clark's defense of Lujan in the California action, where it developed that some pleadings and/or orders filed in the guardianship proceedings, now closed with the record sealed, might be necessary to the defense in the California action (and perhaps prosecution of the Guam action). That is, it appeared that Junior's counsel would cite or quote from the pleading if helpful to their case. But if a sealed record was damaging, they would assert it could not be publicly disclosed because it was under seal. [¶] . . . [¶]

"A few things are undisputed, however, and bear brief mention here. The first is that Calvo & Clark devoted significant resources to its representation of Lujan, and quickly generated significant legal fees. A second undisputed fact is that Lujan complained about the size of the bills and fell behind in paying them. A third is that the relationship was one where the client and his lawyers were in constant contact and communication, with testimony from Lujan and his expert witness, testifying from Lujan's own time records, confirming that in the months of February, March, April and May, they talked essentially every day, sometimes multiple times a day. (Fn. omitted.)

4

A final undisputed matter is that by March 2010 the representation was over, Calvo & Clark having withdrawn.

"As of that point, Lujan had paid Calvo & Clark $326,180, with the firm claiming a balance owed of some $1,120,000. Calvo & Clark tried to negotiate resolution of the outstanding balance with Lujan, to no avail, leading to the action here.

**"The Underlying Action**

"In April 2010, Calvo & Clark filed a complaint for damages in San Francisco Superior Court. The complaint alleged claims for breach of contract, common count, quantum meruit, and account stated. The breach of contract claim sought damages of $1,181,034, plus prejudgment interest; the other three claims sought $1,027,435.89.

"In December 2010, Lujan filed an answer and a cross-complaint. The cross-complaint asserted 10 causes of action against Calvo & Clark, styled as follows: (1) legal negligence; (2) breach of contract; (3) fraud in the inducement; (4) negligent and/or intentional non-disclosure of material facts; (5) bad faith; (6) unjust enrichment; (7) breach of fiduciary duty; (8) negligent misrepresentation; (9) abuse of process; and (10) accounting.

"Over the following months, Calvo & Clark filed demurrers and motions, the effect of which was to eliminate all of Lujan's claims except for breach of contract and breach of the covenant of good faith and fair dealing. Along the way Calvo & Clark's noncontract claims went by the wayside, the upshot of which was that the matter proceeded to trial with each side asserting essentially its contract-based claims, including Lujan's bad faith claim. And Calvo & Clark's damage claim was now $945,947.90.

**"The Trial**

"The case proceeded to jury trial, which began on November 7, 2012, with motions in limine. . . .

"Testimony began on November 16 and was taken over 18 days. On December 12, after the close of Lujan's case on his cross-complaint, Calvo & Clark moved for nonsuit, which the court granted. Thus ended Lujan's action against Calvo & Clark, a ruling which Lujan has not pursued on appeal. (Fn. omitted.)

5

"On December 17 the jury returned its verdict for Calvo & Clark, awarding it $945,947.90, the full amount sought.

**"The Motion for Prejudgment Interest**

"Four days later, on December 21, Calvo & Clark filed a motion for prejudgment interest, seeking interest of 18 percent pursuant to the engagement letter. The trial court ultimately awarded Calvo & Clark interest, not at the rate requested, but at the rate of 10 percent, awarding $331,545.51. . . .

**"The Judgment and Order**

"On January 3, 2013, the court filed its judgment, which provided in pertinent part as follows: 'NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED that Calvo have and recover from Lujan the sum of $945,947.90 together with its disbursements and costs, including expert witness fees, in the amount of $_____, prevailing party attorneys' fees as allowed by contract in the amount of $_____, and pre-judgment interest as allowed by contract in the amount of $_____.'

"On March 4, Lujan filed a notice of appeal from the judgment entered on January 3 (case no. A138210).

"On March 5, the court held a hearing on the motion for prejudgment interest.

"On May 6, Lujan filed a notice of appeal that states that Lujan appeals 'to challenge the court's decision awarding plaintiff prejudgment interest (case no. 139610). The hearing on that motion was held on March 5, 2013. Lujan does not know at this time whether a written order has been entered by the court on that motion but assumes that one was entered.' " (*Calvo Clark & Jacob LLP v. Lujan, supra,* A138210 & A138610.) Following that, the trial court filed its order awarding prejudgment interest.

That ends the quotation from our earlier opinion which, as noted, affirmed both the judgment and the order awarding prejudgment interest. We now set forth the proceedings below leading to this appeal.

**The Cost Bill and the Motion to Tax**

As indicated, the judgment filed on January 3, 2013, had several blanks, anticipating further developments. The first pleading in that regard was on January 31,

6

when Calvo & Clark filed a verified memorandum of costs. The memorandum was supported by worksheets and declarations regarding the costs claimed, most of which were claimed under Code of Civil Procedure section 1032. As pertinent here, Calvo & Clark's cost memorandum also claimed expert witness fees in the amount of $123,227.49, based on a Code of Civil Procedure section 998 offer (998 offer) made prior to trial.

Lujan filed a motion to tax which, as pertinent here, argued that the expert witness fees should be denied because the 998 offer had "ambiguous terms" and "an improper acceptance provision." Calvo & Clark filed opposition.

### The Motion For Attorney Fees

The second anticipated pleading came on March 6 when Calvo & Clark filed a motion for attorney fees. The motion was based on the engagement letter Lujan had signed when Calvo & Clark undertook his representation, which letter contained this provision: "In the unlikely event that we are required to institute legal proceedings to collect fees and costs, the prevailing party would be entitled to a reasonable attorney's fee and other costs of collection." The motion sought $1,532,674.81.

Calvo & Clark's motion was accompanied by extensive supporting material. Counting the motion itself, Calvo & Clark's moving papers in support of the motion totaled 862 pages. That supporting material included four declarations, those of Edward Swanson, Mark Tuft, William Hebert, and Gary Greenfield. Messrs. Swanson and Tuft were the attorneys who, along with their firms, had represented Calvo & Clark in the litigation with Lujan. Their declarations testified in detail to the work they and their firms had done, much of which, they testified, was necessitated by Lujan's own litigation tactics. Those declarations also attached numerous exhibits from the litigation, put before the court to demonstrate some of the reasons why the lawyers spent the time they did.

Mr. Hebert, a member of Calvo & Clark, testified to the facts that the firm had incurred $153,460 in fees and $6,606 in costs before it retained Mr. Swanson's firm, and an additional $426,000 in fees and costs after the Swanson firm was retained. Mr. Hebert also testified to the over $78,000 fees and costs Calvo & Clark had spent to defend itself

7

in an action for legal malpractice against the firm Lujan had filed in Guam. Mr. Hebert went on to describe in detail the education and experience of the nine attorneys who in fact did the work, and also provided a detailed breakdown of their work.

Mr. Greenfield, an expert witness in attorney fees, testified in a 19-page declaration that was accompanied by 13 exhibits, included among which were invoices from the firms that had represented Calvo & Clark and rate analyses of the lawyers at those firms. The essence of Mr. Greenfield's declaration was his opinion that the fees claimed in Calvo & Clark's motion were reasonable, an opinion based on three criteria: (1) a detailed review and analysis of the attorneys' time; (2) an analysis of the work done by the attorneys and the fees incurred under the factors commonly considered by the court in fixing a reasonable fee award; and (3) an assessment of the reasonable hourly rate for the attorneys' services.

On April 23, 2013, Lujan filed opposition to Calvo & Clark's motion for attorney fees. That opposition was supported by a declaration from André Jardini, Lujan's fee expert, who opined that the fees requested were not reasonable, going on to detail what he perceived to be manifestations of such unreasonableness. Lujan also filed evidentiary objections to all four of Calvo & Clark's declarations, asserting numerous objections, including relevancy, hearsay, and lack of foundation.

Calvo & Clark filed a reply to the opposition, and also replies to the evidentiary objections. The reply included supplemental declarations of Swanson, Tuft, and Greenfield. The reply also included six new declarations, those of various attorneys who were actually involved in the litigation with Lujan: Mark Brewster, Andrew Dilworth, Britt Evangelist, William Fitzgerald, Anne Griffith, and Sarah Banola.

All told, by the conclusion of the briefing, the motion for attorney fees totaled over 1,500 pages. Or, as the trial court would later describe it at the hearing, "seven inches of paper here. So we're not gonna decide that today either, but I'll be attending to what you have to say about it."

We digress from the chronology of the proceedings below to note two things about the attorney fee issue following the completion of the briefing. The first is that the

$1,532,674 Calvo & Clark was seeking did not include all the fees the firm had incurred. To the contrary, its moving papers had closed with the observation that "The fees requested by this motion have been reviewed and approved by sophisticated entities—Calvo [& Clark] and its insurance carrier—with an interest in keeping fees down and ensuring cost-effective litigation. In addition, Calvo [& Clark] and its law firms took various steps to cost-effectively manage the case by coordinating the work done by the two firms to avoid duplication of work and other inefficiencies. Finally, Calvo [& Clark], its attorneys and its fee expert have made significant deductions from the firms' bills before submitting this motion, which further speaks to the reasonableness of the fees sought. Specifically, the total fees sought by this motion do *not* include: (1) approximately $45,000 in fees written-off or down by Cooper White & Cooper, LLP during the pre-bill process; (2) approximately $80,000 in fees written-off or down by Swanson & McNamara, LLP during the pre-bill process; (3) approximately $162,000 in fees [Calvo & Clark] decided not to seek; and (4) approximately $22,000 in deductions recommended by Calvo's fees expert, Mr. Greenfield." In sum, Calvo & Clark's motion had eliminated over $300,000 of the fees it had actually incurred.

The second fact is that while Calvo & Clark's reply brief took vigorous issue with Lujan's fee expert Jardeni in all respects, Calvo & Clark did acknowledge "an accidental double entry for .7 hours by Ms. McNamara on September 16, 2011 and agrees to a $210 deduction." Based on that, Calvo & Clark's final request for attorney fees was in the amount of $1,532,464—$210 less than that sought in its moving papers.

Lujan's motion to tax costs and Calvo & Clark's motion for attorney fees both came on for hearing on May 6, 2013. The court heard lengthy argument, at the conclusion of which it took both matters under submission.

On August 5, 2013, the trial court filed its order which, after the recitals, concluded as follows:

"The court overrules all of defendant's evidentiary objections.

9

"The court has read and considered the parties' papers in support of and in opposition to the two motions. The court has heard and considered the remarks of counsel at the hearing. The court finds good cause to make the following orders.

"The court grants defendant's motion to tax costs in the following respect. The court disallows messenger fees in the amount of $3,207.09. In all other respects, the court denies the motion to tax costs. The court grants plaintiff's motion for recovery of attorney fees. The court awards plaintiff reasonable attorney fees in the amount of $1,532,674.81."[2]

---

[2] Lujan's reply brief devotes several pages to criticizing the trial court's order, which Lujan cynically refers to as "the 'court's order'—the order prepared by Calvo [& Clark]." Following completion of briefing, we received a letter from Lujan's attorney which referred to the above assertion in his brief, and went on as follows: "After we filed our brief, respondent's counsel disputed this assertion, stating that the order signed by the trial judge on that motion was prepared by the trial court, not by respondent's counsel. [¶] While respondent's position is inconsistent with our recollection, we have decided to withdraw the assertion that the order granting the attorneys' fee motion was prepared by respondent."

Lujan's opening brief had also criticized the trial court order along similar lines, opening with this: "The trial court's decision to rubber-stamp the entire amount sought by the law firm is exacerbated by the court's decision to award fees that the law firm ultimately conceded were improper (i.e., fees admittedly based on computational errors)." Lujan's brief also refers to this later, asserting that Calvo & Clark's papers supporting the motion for attorney fees "rais[e] serious questions regarding [the court's] ruling and reasoning," because Calvo & Clark subsequently adjusted its demand downwards in reply to reflect a clerical billing error."

While there is no question the trial court's order did not reflect the "double counting" acknowledged in Calvo & Clark's reply papers, it cannot be overlooked that the adjustment accounted for 0.7 hours of work, or $210. And as to this, Calvo & Cark responds this way, "Given the parties' voluminous filings on the fees motion and the small amount of the adjustment, it is reasonable to conclude that after carefully determining Calvo & Clark's entitlement to all fees sought, the trial court simply erred by using the figure in Calvo & Clark's moving papers instead of the figure in its reply papers when it crafted its order. Absent some affirmative evidence that the amount awarded resulted from faulty legal reasoning or an abuse of discretion rather than a scrivener's error, the trial court's order should be affirmed. (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1140.)"

## DISCUSSION

### The Law and the Standard of Review

We have on many occasions set out the law and the standard of review when the issue is the reasonableness of attorney fees awarded, most recently in *Syers Properties III, Inc. v. Rankin* (2014) 226 Cal.App.4th 691, 697–698:

"The abuse of discretion standard governs our review of the trial court's determination of a reasonable attorney fee.  (E.g., *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1140; *PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1096 (*PLCM Group*); accord, *Nemecek & Cole v. Horn* (2012) 208 Cal.App.4th 641, 650 (*Nemecek*).)

" 'Under the lodestar method, attorney fees are calculated by first multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate of compensation.  (See *Ketchum v. Moses, supra,* 24 Cal.4th at p. 1136; *Serrano v. Priest* (1977) 20 Cal.3d 25, 48, fn. 23; [citation].)'  (*Chacon v. Litke* (2010) 181 Cal.App.4th 1234, 1259; *id.* at p. 1260 [This court held the lodestar method appropriate for calculating the fee award and we affirmed a fee award that exceeded the actual hourly rate under the fee agreement where the fee shifting ordinance at issue provided '[t]he prevailing party shall be entitled to reasonable attorney's fees and costs . . . .'].)

"Our Supreme Court has recognized that the lodestar is the basic fee for comparable legal services in the community and that it may be adjusted by the court based on a number of factors in order 'to fix a fee at the fair market value for the particular action. . . .  "[T]he Legislature appears to have endorsed the [lodestar adjustment] method of calculating fees, except in certain limited situations."  [Citation.]  When the Legislature has determined that the lodestar adjustment approach is not appropriate, it has expressly so stated.'  (*Ketchum v. Moses, supra,* 24 Cal.4th at pp. 1134–1135; accord, *Chacon v. Litke, supra,* 181 Cal.App.4th at p. 1259.)  . . .  Here,

---

We share that assessment, and in light of the record here will modify the order, reducing it by $210.  (Code Civ. Proc. § 906; *Sagadin v. Ripper* (1985) 175 Cal.App.3d 1141, 1170.)

as appropriate in this type of case, counsel were compensated based on the lodestar calculated by the court, without adjustment."

We had earlier described the standard of review in *Thayer v. Wells Fargo Bank* (2001) 92 Cal.App.4th 819, 832: "Because the sole issue before us . . . is the amount of fees awarded, our review is deferential. ' "The 'experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong'—meaning that it abused its discretion." ' (*PLCM Group v. Drexler* (2000) 22 Cal. 4th 1084, 1095, quoting *Serrano v. Priest* (1977) 20 Cal. 3d 25, 49 and citing *Fed-Mart Corp. v. Pell Enterprises, Inc.* (1980) 111 Cal. App. 3d 215, 228 [an appellate court will interfere with a determination of reasonable attorney fees 'only where there has been a manifest abuse of discretion'].)" Indeed, our colleagues in Division Four have observed that the "only proper basis of reversal of the amount of an attorney fees award is if the amount awarded is so large or so small that it shocks the conscience and suggests that passion and prejudice influenced the determination." (*Akins v. Enterprise Rent-A-Car Co.* (2000) 79 Cal.App.4th 1127, 1134.)

That, then, is the law that governs here, law that requires Lujan to demonstrate an abuse of discretion—a demonstration Lujan fails to make.

**The Attorney Fees Awarded Were Proper**

Lujan's opening brief has one primary argument on the attorney fee issue, an argument that reads as follows: "The Trial Court Erred By Holding That Calvo Is Entitled to Recover Any Attorneys' Fees in This Case Beyond the Fees Incurred to Pursue Its Affirmative Claim for Breach of Contract." There follows a boldface heading which Lujan asserts are the "statutory and contractual provisions invoked by Calvo to justify fee shifting," and the text that follows begins with citation to Civil Code section 1717, subdivision (a) (section 1717) reference to which section is repeated throughout Lujan's brief. [3]

---

[3] Civil Code section 1717, subdivision (a) provides in pertinent part:

Lujan's argument proceeds from an erroneous premise, that the basis for Calvo & Clark's fees is section 1717.  As our Presiding Justice Kline has observed, "[a]s appellate courts have reiterated on numerous occasions . . . section 1717's 'only effect is to make an otherwise unilateral right to attorney fees reciprocally binding upon all parties to actions to enforce the contract.' [Citations.]"  (*Sears v. Baccaglio* (1998) 60 Cal.App.4th 1136, 1159 [concurring and dissenting opinion]; accord *Santisas v. Goodin* (1998) 17 Cal.4th 599, 610 ["The primary purpose of section 1717 is to ensure mutuality of remedy for attorney fee claims under contractual attorney fee provisions."]  In short, section 1717 is not the basis for the fees.  The engagement letter is.

*Gonzales v. Personal Storage, Inc.* (1997) 56 Cal.App.4th 464, 480 is instructive.  There, Gonzales successfully sued defendant storage facility for emotional distress suffered when the facility converted her personal property.  Despite that success, the trial court denied Gonzales attorney fees.  The Court of Appeal reversed, observing as follows:  "We note that in denying Gonzales's request for attorney fees, the trial court appeared to also rely on the fact that in addition to her out-of-pocket losses Gonzales was awarded a substantial sum in tort damages for her emotional suffering.  However, unlike attorney fees available under Civil Code section 1717, the attorney fees provision in Personal Storage's lease agreement is not restricted to contract actions.  By its terms it applies to 'any legal action.'  Agreements which contain such broad language permit the recovery of attorney fees in tort as well as contract actions.  (See *Xuereb v. Marcus & Millichap, Inc.* (1992) 3 Cal.App.4th 1338, 1340; *Honey Baked Hams, Inc. v. Dickens* (1995) 37 Cal.App.4th 421, 425; *Palmer v. Shawback* (1993) 17 Cal.App.4th 296, 299;

---

"(a) In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs. [¶] . . . [¶]

"Reasonable attorney's fees shall be fixed by the court, and shall be an element of the costs of suit. . . ."

*Lerner v. Ward* (1993) 13 Cal.App.4th 155, 160–161.)  Because the attorney fee clause in the lease expressly permitted recovery to either party in the event of a tort action, Gonzales cannot be denied recovery of attorney fees solely because she was successful in the tort portions of her lawsuit."  (*Id.* at p. 480.)

The leading California attorney fee treatise has a section entitled, "§ 4.3  C. Parties May Also Agree to Fee-Shifting for Noncontract Causes of Action, *Which Are Not Governed by CC § 1717.*"  And that section goes on:  "The parties to a contract may agree that the prevailing party may recover attorney fees not only for work on contract causes of action but also for work attributable to tort and other noncontract claims. . . . For the fee clause to apply to noncontract claims, its language must be broad enough to clearly show that the parties intended it to do so. . . ."  (1 Pearl, Cal. Attorney Fee Awards (3d ed. 2014) § 4.3, p. 4-6, italics added.)

Numerous cases have applied the language in the parties' agreements to affirm an award of fees, illustrated, for example, by these five:

*Maynard v. BTI Group, Inc.* (2013) 216 Cal.App.4th 984, 993:  in arbitrating or litigating "any dispute";

*Cruz v. Ayromloo* (2007) 155 Cal.App.4th 1270, 1277:  if "civil action is instituted in connection with this Agreement";

*Thompson v. Miller* (2003) 112 Cal.App.4th 327, 336:  "any dispute under the [agreements]";

*Moallem v. Coldwell Banker Com. Group, Inc.* (1994) 25 Cal.App.4th 1827, 1831: action "relating to the contract."

*Xuereb v. Marcus & Millichap, Inc., supra,* 3 Cal.App.4th 1338, 1342–1343:  for any action to which the agreement "gives rise";

The attorney fee provision here, quoted above, provides that "In the unlikely event that we are required to institute legal proceedings to collect fees and costs, the prevailing party would be entitled to a reasonable attorney's fee and other costs of collection." That is what Calvo & Clark, the prevailing party, was entitled to recover.  That is what the trial court awarded.

14

*Finalco, Inc. v. Roosevelt* (1991) 235 Cal.App.3d 1301 (*Finalco*) is persuasive. Finalco sued Roosevelt on a note providing that the maker " 'agrees to pay all costs of collection . . . including . . . all attorney's fees and expenses.' " (*Id.* at p. 1306.) Roosevelt filed an answer and a cross-complaint, raising numerous claims based on violations of federal and state securities laws, RICO, and common law fraud and misrepresentation. The trial court awarded Finalco $71,562 in attorney fees. Roosevelt appealed, and the Court of Appeal affirmed, in language particularly apt here:

"Roosevelt contends the term 'costs of collection' limits Finalco to recovery of the reasonable attorneys' fees incurred in proving up its action on the note but does not permit Finalco to recover attorneys' fees incurred in defending against Roosevelt's cross-complaint. He argues the term 'cost of collection' was insufficient to put him on notice he would be obligated to pay Finalco's attorneys' fees incurred in defending a separate claim regarding the validity of the underlying sale of the units under federal securities laws. Furthermore, such a construction of the attorneys' fees provision would conflict with public policy to encourage prosecution of securities fraud actions. We disagree with both of Roosevelt's contentions." (*Finalco, supra,* 235 Cal.App.3d at p. 1306, fn. omitted.)

The court went on to describe how Finalco was "obligated to defend [the cross-complaint] in order to succeed on its complaint," and how both actions were "inextricably intertwined." (*Finalco, supra,* 235 Cal.App.3d at p. 1307.) Likewise here.

Lujan's brief proceeds with some subarguments, two of which we quote here: first, that "All of the Fees Incurred to Litigate the Non-Contract Claims Raised in Calvo's Complaint Should Have Been Rejected"; and second, that "With Respect to the Attorneys' Fees Incurred to Defend Lujan's Cross-Complaint, Section 1717 Does Not Authorize the Recovery of Fees for Any of the Causes of Action Alleged in the Cross-Complaint." These arguments fail for the reasons set forth above, including that the fees awarded are all "costs of collection." These arguments also fail for several other reasons.

15

One reason is, as Pearl distills it, this: "Parties prevailing on the contract claim also may be entitled to compensation for time spent on noncontract claims that *contributes* to the success of the contract claim." (1 Pearl, Cal. Attorney Fee Awards, *supra*, § 4.100, p. 4-76, citing, among other cases, *Finalco, supra,* 235 Cal.3d 1301 which the author describes as including fees to plaintiff for "defending against the defendant's cross-complaint based on securities fraud because defeat of the cross-complaint was essential to recovery on the complaint"; and *MRW, Inc. v. Big-O Tires, LLC* (E.D. Cal. 2010) 684 F.Supp. 2d 1197, 1205 [describing the "time spent defending tort claims compensable because necessary to enforce contract claims"].)

A second, and related, reason is found in those cases holding that where plaintiff's defense against a cross-claim is necessary to success on the plaintiff's contract claim, plaintiff is entitled to all its fees. *Siligo v. Castellucci* (1994) 21 Cal.App.4th 873, 877-879 (*Siligo*) is illustrative. Siligo sued in connection with the sale of a business, in response to which Castellucci filed a cross-complaint for fraud. The trial court ruled for Siligo, who thereafter brought a motion for attorney fees. This is how the Court of Appeal described what occurred: "Siligo sought $400,000 in attorney fees under clauses of the consulting and put agreements. In proving up this amount Siligo submitted his attorneys' invoices. The invoices revealed that Siligo's attorneys separated the attorney fees into two categories: one for services rendered for the prosecution of the breach of contract action and one for services rendered for the defense of the fraud cross-complaint. [¶] "That Siligo's fees were capable of being divided in this manner motivated the trial court to make the same division in its award. It cited *Stout v. Turney* (1978) 22 Cal.3d 718 for the general proposition that a tort action for fraud arising out of a contract is not an action 'on the contract' within the meaning of Civil Code section 1717. It then reasoned: 'If the causes of action are separate and the fees can be allocated then the prevailing party is only entitled to those fees related to the contract.' In the judgment, the trial court awarded Siligo $80,000 for his attorney fees. (*Id.* at p. 877, fns. omitted.)

The Court of Appeal held the trial court's "reasoning is erroneous." (*Siligo, supra,* 21 Cal.App.4th 873 at p. 877.) The court went on at length to explain why, beginning

16

with the observation that "Civil Code section 1717 does not independently bar an award for attorney fees in a tort action. . . ." and then continued on as follows:

"Second, California law is settled that an obligation to pay attorney fees incurred in the enforcement of a contract 'includes attorneys' fees incurred in defending against a challenge to the underlying validity of the obligation.' (*Finalco*[, *supra,*] 235 Cal.App.3d 1301, 1308.)

"In *Wagner v. Benson* (1980) 101 Cal.App.3d 27, the plaintiffs sued a bank for fraud and negligence in connection with a loan transaction, and the bank filed a cross-complaint to collect the balance due under the promissory notes signed in the transaction. The bank prevailed on the complaint and cross-complaint, but the trial court limited the bank's award of attorney fees to the fees incurred in suing on the promissory notes. The Court of Appeal reversed. It reasoned: 'Here the parties have agreed to compensate the prevailing party for reasonable costs incurred in collecting the balance due on the notes. However, the Bank's collection efforts were interrelated with its defense against the [plaintiff's] fraud allegations. Defense of the charge of fraud was necessary in the Bank's efforts to collect the notes [citations].' (*Id.* at p. 37.)" (*Siligo, supra,* 21 Cal.App.4th 873 at pp. 877-878.)

*Siligo* then discussed at length *IMO Development Corp. v. Dow Corning* (1982) 135 Cal.App.3d 451, referred briefly to two other cases, and summed up as follows: "Thus, the pivotal point in the analysis whether a prevailing party is entitled to recover contractual attorney fees for defending against a competing nonconractual claim (when the language of the agreement does not encompass noncontractual claims or is ambiguous) is not whether the fees can be apportioned between the theories but whether a defense against the noncontractual claim is necessary to succeed on the contractual claim." (*Id.* at pp. 878-879.) And held that it was. Just as it was here.

It is commonly understood that "[c]ollection suits by attorneys result frequently in counterclaims and threats to sue cause clients to file malpractice suits." (Mallen & Smith, Legal Malpractice (2015) §§ 2.10, p. 164.) While this may frequently be nothing more than confirmation of the adage that "the best defense is a good offense," were the

17

client's claim to prevail, it could have a significant effect on the amount of fees collected, if any. Calvo & Clark's defense against Lujan's cross-complaint manifestly contributed to the firm's success.

A third, and separate, reason why Lujan's arguments fail is that the claims were so intertwined as to make it impracticable, if not impossible, to separate the attorneys' time, exemplified by *Maxim Crane Works, L.P. v. Tilbury Constructors* (2012) 208 Cal.App.4th 286 (*Maxim*). *Maxim* arose when a construction worker sued Maxim, a crane company, for personal injuries arising from a worksite incident. Maxim filed a cross-complaint against the injured worker's employer, Tilbury, seeking indemnity. The cross-complaint failed, as the trial court enforced an unfavorable choice-of-law provision in the contract written by Maxim, and found the indemnity agreement inapplicable to the employee's claim. The trial court thereafter awarded Tilbury its full attorney fees, accepting "Tilbury's contention that defense against Maxim's cross-complaint was 'inextricably intertwined' with Tilbury's defense against Gorski's tort suit." (*Id.* at p. 297.) The Court of Appeal affirmed.

After beginning with the observation its scope of review was "narrow," the court noted that " '[t]he burden is on the party complaining to establish that discretion was clearly abused and a miscarriage of justice resulted.' (*Carver v. Chevron U.S.A., Inc.* (2004) 119 Cal.App.4th 498, 505 [(*Carver*)]; see *Thompson Pacific Construction, Inc. v. City of Sunnyvale* (2007) 155 Cal.App.4th 525, 556 ['The trial court . . . was in the best position to determine whether the issues were so intertwined that allocation would be impossible.'].)" (*Maxim, supra,* 208 Cal.App.4th at pp. 297-298.) *Maxim* then concluded with this:

"The California Supreme Court has stated that, 'Attorney's fees need not be apportioned when incurred for representation on an issue common to both a cause of action in which fees are proper and one in which they are not allowed.' (*Reynolds Metals Co. v. Alperson* (1979) 25 Cal.3d 124, 129-130; see *Abdallah v. United Savings Bank* (1996) 43 Cal.App.4th 1101, 1111.)

18

"Further, 'Apportionment is not required when the claims for relief are so intertwined that it would be impracticable, if not impossible, to separate the attorney's time into compensable and noncompensable units.' (*Bell v. Vista Unified School Dist.* (2000) 82 Cal.App.4th 672, 687; see *Drouin v. Fleetwood Enterprises* (1985) 163 Cal.App.3d 486, 493 ['Attorneys fees need not be apportioned between distinct causes of action where plaintiff's various claims involve a common core of facts or are based on related legal theories'].)" (*Maxim, supra,* 208 Cal.App.4th at p. 298.)

Here, too, the facts were "inextricably intertwined"—indeed, including by Lujan's own strategic decision. Lujan alleged the identical facts in support of all his claims, a practice that continued through the discovery stages of the litigation, where Lujan relied on the same factual responses in support of all causes of action in his cross-complaint. Thus, for example, his responses to the second set of special interrogatories set forth the exact same facts in support of breach of contract cause of action as in the negligence and fraud in the inducement causes of action. As our colleagues in Division Four described, this made it " 'impracticable, if not impossible, to separate the multitude of conjoined [defensive] activities into compensable or noncompensable time units.' " (*Abdallah, supra,* 43 Cal.App.4th at p. 1111.)

Within his primary argument Lujan briefly makes two additional subarguments. The first is that Calvo & Clark was not the prevailing party on the three causes of action it had filed which were not in fact presented to the jury. The complete answer is contained in our analysis above.

Lujan's second subargument is that no fees should be awarded for the defense against Lujan's own breach of contract claim because his claim was dismissed by the trial court, and he did not pursue an appeal from that dismissal. So, the argument runs, fees are precluded by what Lujan calls the "statutory immunity allowed under Civil Code section 1717."

Section 1717, subdivision (b)(2) provides in pertinent part as follows: "Where an action has been voluntarily dismissed or dismissed pursuant to a settlement of the case, there shall be no prevailing party for purposes of this section." Lujan claims that by

19

voluntarily dismissing the appeal, he voluntarily dismissed the action. The argument is fatuous. As mentioned above, eight of the 10 causes of action in Lujan's cross-complaint were dismissed prior to trial, by demurrer or motion. The remaining two, breach of contract and bad faith, were dismissed on nonsuit. The dismissals hardly qualify as "voluntary."

At oral argument in the trial court, Lujan in essence argued it is not reasonable to spend over $1,500,000 in attorney fees in connection with the pursuit of a $945,000 claim. As his counsel put it: "Essentially, they're seeking over 150 percent of the amount of recovery that they had from the jury. They're seeking that much just in attorney's fees alone. And that, I think, in and of itself, shows an ultimate form of reasonableness which would trigger the Court's discretion under Chavez to completely deny the fees." Lujan's briefing here makes similar intimations. We have two observations.

First, Calvo & Clark's fee case hardly arose out of run-of-the-mill representation of Lujan. Rather than involving defense of Lujan in a single case, Calvo & Clark's representation involved five actions, two of which had their genesis in earlier proceedings that had concluded years before—the Hillblom estate matter and the guardianship proceeding involving Junior. In short, representation of Calvo & Clark in presentation of its case seeking fees against Lujan and its defense against his cross-complaint required its counsel to master the factual and legal history of some seven underlying matters.

Second, and significantly, the amount of attorney fees incurred by Calvo & Clark in pursuit of its fee case was increased by Lujan's own conduct, which might be called less than forthcoming when Calvo & Clark sought discovery—and aggressive when Lujan was the proponent. On the one hand, Lujan often provided inadequate discovery responses, requiring Calvo & Clark to bring several motions to compel. On the other, Lujan served broad requests for production that required significant time to gather responsive documents (from three different offices) and prepare those documents for production. In total, in response to Lujan's requests for production, Calvo & Clark produced over 255,000 pages of documents, including over 11,000 emails. Further, after

20

the discovery deadline passed, Lujan successfully moved to reopen discovery to take the depositions of six additional Calvo & Clark witnesses. And after the deadline to designate experts passed, Lujan moved to augment his expert witness list. This succeeded, causing additional attorney fees preparing for and deposing Lujan's new expert. And all apparently wasted, as Lujan did not oppose Calvo & Clark's motion to exclude the expert and failed to make an offer of proof regarding the admissibility of his expert's testimony as invited by the court.

The Supreme Court's observation in *Serrano v. Unruh* (1982) 32 Cal.3d 621, 638—there, about the California Attorney General—can be said about Lujan here: one "cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response." (Accord, *Peak-Las Positas Partners v. Bollag* (2009) 172 Cal.App.4th 101, 114.)

Lujan's final argument on the attorney fee issue contends that the trial court abused its discretion when "it did not even attempt to conduct an apportionment of the fees."[4] We disagree.

The law is well settled: "Once a trial court determines entitlement to an award of attorney fees, apportionment of that award rests within the court's sound discretion." (*Carver, supra,* 119 Cal.App.4th at p. 505.) "The burden is on the party complaining to establish that discretion was clearly abused and a miscarriage of justice resulted." (*Ibid.*) Lujan ignores this law—and the record.

Calvo & Clark argued to the trial court that apportionment would be improper here for several reasons, including that the contract and noncontract causes of action were inextricably intertwined, both factually and legally. Lujan's opening brief asserts that this argument "was dead wrong on the law," and cites two cases holding that "[a] court

---

[4] The argument goes so far as to assert that Calvo & Clark "misled the court into believing that it had no discretion to apportion the fees." The argument is one paragraph long, and cites *Platypus Wear, Inc. v. Goldberg* (2008) 166 Cal.App.4th 772, 782, which Lujan described this way: "abuse of discretion is . . . shown where the trial court 'erred in acting on a mistaken view about the scope of its discretion.' " Lujan makes no such "showing" here.

21

may apportion fees even where the issues are connected, related or intertwined": *El Escorial Owners Assn. v. DLC Plastering, Inc.* (2007) 154 Cal.App.4th 1337, 1365, and *Carver*, *supra,* 119 Cal.App.4th at p. 506.  True enough.  But the cases do not avail Lujan, standing, as they do, only for the settled proposition that a trial court has discretion to apportion or not apportion attorney fees depending upon the facts and circumstances before it.  To put it conversely, neither of the cases holds that a trial court must apportion fees, only that it "may."

### The Expert Witness Fees Were Proper

Prior to trial, Calvo & Clark extended to Lujan a Code of Civil Procedure section 998 offer (998 offer) that read as follows:  "Calvo . . . offers to allow judgment to be entered in Calvo's favor and against . . . Lujan . . . for payment by Lujan to Calvo of the sum of $665,818 (six hundred sixty-five thousand, eight hundred and eighteen dollars).  This sum is in satisfaction of all claims of damages, including interest thereon, made by Plaintiff in the above entitled action.  [¶] By accepting this offer, Lujan also agrees:  (1) to dismiss with prejudice all causes of action against Calvo in his cross-complaint filed in the above entitled action on December 6, 2010 (and as amended on December 12, 2011), taking nothing thereon; and (2) to execute and transmit to Calvo a General Release in favor of Calvo of all claims between Lujan and Calvo in this action."

Lujan did not respond to the offer and, as noted, Calvo & Clark recovered $945,947 at trial.

As discussed above, Calvo & Clark's memorandum of costs sought among other things, $123,227 in expert fees based on its verdict that exceeded the 998 offer.  Lujan filed a motion to tax, which the trial court granted in part, but not as to the expert witness fee, awarding Calvo & Clark what it requested.

Lujan's second contention on appeal is that the award of expert witness fees was improper, on the basis that the 998 offer was invalid, for two separate reasons:  (1) the offer was in bad faith because it was silent as to attorney fees; and (2) the offer was ambiguous.

Lujan's "bad faith" argument begins with the claim that the 998 offer "was defective because it did not expressly contemplate resolution of the pink elephant in the room; i.e., the issue of attorneys fees." Lujan cites no case in support of his bad faith argument,[5] which is perhaps not surprising, as 998 offers that do not address attorney fees have been held enforceable. (See, for example, *Elite Show Services, Inc. v. Staffpro, Inc.* (2004) 119 Cal.App.4th 263, 268–269; *Ritzenthaler v. Fireside Thrift Co.* (2001) 93 Cal.App.4th 986, 988.) The result is that when a 998 offer is silent as to costs and fees, contractual or statutory attorney fees are recoverable in addition to the amount of the accepted offer. (*Ritzenthaler, supra,* 93 Cal.App.4th at p. 991; *Engle v. Copenbarger & Copenbarger, supra,* 157 Cal.App.4th at pp. 168–169; *Wohlgemuth v. Caterpillar Inc.* (2012) 207 Cal.App.4th 1252, 1259–1263.)

The decision whether a 998 offer was reasonable and in good faith lies within the discretion of the trial court, reversible only if we find an abuse of that discretion. (*Regency Outdoor Advertising, Inc. v. City of Los Angeles* (2006) 39 Cal.4th 507, 531; *Hartline v. Kaiser Found. Hosps.* (2005) 132 Cal.App.4th 458, 471–473; *Nelson v. Anderson* (1999) 72 Cal.App.4th 111, 136.) We find none.

It is perhaps enough to note that the verdict for $945,947 Calvo & Clark was higher than the $665,818 offer. This "constitutes prima facie evidence showing the offer was reasonable." (*Sanantonio v. Westinghouse Broadcasting Co.* (1994) 25 Cal.App.4th 102, 116–117.) Moreover, had Lujan accepted Calvo & Clark's offer, the firm would have forsaken some $300,000 of the unpaid attorney fees it was seeking. Beyond that, because the offer was inclusive of interest, Calvo & Clark would have lost hundreds of thousands of dollars in prejudgment interest, not to mention risking the recovery of attorney fees: had Lujan accepted the offer, he could have argued that Calvo & Clark had not achieved a "complete victory," giving the trial court discretion to decide whether it

---

[5] Lujan's brief does contain this citation: "*Engle v. Copenbarger & Copenbarger* (2007) 157 Cal.App.4th 165, 169 [a section 998 offer to compromise excludes fees only if it says so expressly]." This is hardly supportive.

prevailed.  Lujan has not demonstrated that the offer was not in good faith.  Or ambiguous.

In Lujan's words, the offer was ambiguous because the parties would be left to "fight over the terms of the 'General Release.' "  Lujan cites one case in claimed support, *Chen v. Interinsurance Exchange of Automobile Club* (2008) 164 Cal.App.4th 117.  It is not supportive, the court noting that *Goodstein v. Bank of San Pedro* (1994) 27 Cal.App.4th 899 "establish[es] that a general release can be part of a valid 998 offer." (*Chen v. Interinsurance Exchange of Automobile Club, supra,* at p. 123.)

Lujan also claims the language of the offer created ambiguity because it "left Lujan to guess" whether the offer would resolve the claims in his cross-complaint as well as those made in Calvo & Clark's complaint.   In the first paragraph, Calvo & Clark offered to resolve all of its claims against Lujan.  In the second paragraph, Calvo & Clark explicitly stated that by accepting the offer, Lujan also agreed "to dismiss with prejudice all causes of action against Calvo in his cross-complaint . . . taking nothing thereon."  The offer left no room for ambiguity.

### DISPOSITION

The order of August 5, 2013, is modified to provide that the attorney fees awarded are $1,532,464.81, and as so modified the order is affirmed.


_____
Richman, J.


We concur:


_____
Kline, P.J.


_____
Stewart, J.


24

A139863, *Calvo Fisher & Jacob LLP v. David J. Lujan*

| | |
|---|---|
| Trial Court: | Superior Court of the City and County of San Francisco |
| Trial Judge: | Honorable Wallace P. Douglass |
| Attorney for Defendant and Appellant: | Wilson, Elser, Moskowitz, Edelman & Dicker, Edward Garson, Robert Cooper |
| Attorneys for Plaintiff and Respondent: | Swanson & McNamara, Edward Swanson, Britt Evangelist; Cooper, White & Cooper, Sarah Jane Banola |