Filed 1/28/26

**CERTIFIED FOR PARTIAL PUBLICATION†**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| MAYNARD MATTHEWS et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> PATRICK RYAN, <br><br> Defendant and Appellant. | B335736, B338256, B339211 <br><br> (Los Angeles County Super. Ct. No. 19STCV10899) |

APPEALS from a judgment and orders of the Superior Court of Los Angeles County, Mel Red Recana (case Nos. B335736 & B339211) and Rolf M. Treu (case No. B338256), Judges.  Affirmed in part, reversed in part, and remanded with directions.

---

† Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication, with the exception of part C of the Discussion.

Parris Law Firm, Jason P. Fowler, Jonathan W. Douglass; Benedon & Serlin, Gerald M. Serlin, Judith E. Posner and Drew Musto for Plaintiffs and Appellants.

Horvitz & Levy, David M. Axelrad, Lacey L. Estudillo; McClaugherty and Associates, Jay S. McClaugherty and Garrett Nelson for Defendant and Appellant.

_____

Defendant Patrick Ryan appeals from a judgment in favor of plaintiffs Maynard and Tanis Matthews (Mr. and Mrs. Matthews, respectively) in an action arising from an automobile collision. Plaintiffs cross-appeal from two postjudgment orders, one denying their request for prejudgment interest under Code of Civil Procedure section 998 and Civil Code 3291, and one denying their request for costs of proof under Code of Civil Procedure section 2033.420.

Defendant challenges the method by which the trial court sat prospective jurors in the jury box for voir dire. After the prospective jurors gathered in the courtroom, the court asked for volunteers to sit in the jury box for voir dire rather than seating them from the gallery based on juror number. Defendant did not object to this method below, and his challenge therefore is forfeited.

Plaintiffs contend the trial court erred in finding their pretrial settlement offer invalid under Code of Civil Procedure section 998 because it was conditioned on the consent of defendant's insurer. We agree with plaintiffs. A defending insurer is not bound by a settlement to which it does not consent. Thus, a defending insurer's consent is necessarily a condition of settlement whether or not so stated in the settlement offer. Plaintiffs' express inclusion of that condition in their offer was

2

redundant and did not render the offer invalid under Code of Civil Procedure section 998.  Because the trial court did not address defendant's contention that plaintiffs' offer was unreasonable and in bad faith, we remand for the trial court to address this issue.

In the unpublished portion of the opinion, we reject plaintiffs' arguments that the trial court erred in denying their motion for costs of proof under Code of Civil Procedure section 2033.420.

Accordingly, we affirm the judgment and the order denying costs of proof, and reverse the order denying prejudgment interest under Code of Civil Procedure section 998 and Civil Code section 3291.

## BACKGROUND

We provide a general summary of the procedural history below.  We provide additional procedural background pertinent to each issue on appeal in the related sections of our Discussion, *post*.

Plaintiffs, who are husband and wife, sued defendant for negligence and loss of consortium.  The complaint alleged defendant collided his vehicle into Mr. Matthews' vehicle, thereby severely injuring Mr. Matthews.

Plaintiffs offered to settle the matter for $749,999.99. Defendant did not accept the offer.

Following trial, the jury returned a verdict finding defendant negligent and 100% at fault for the accident.  The jury awarded Mr. Matthews $6,536,330.66, and Mrs. Matthews $343,750.00. The trial court entered judgment in plaintiffs' favor.

Defendant moved for a new trial arguing, inter alia, jury selection had violated statutes mandating random selection of jurors. The trial court denied the motion.

Plaintiffs moved for prejudgment interest under Code of Civil Procedure section 998 and Civil Code section 3291 based on defendant's refusal of their settlement offer. They also moved under Code of Civil Procedure section 2033.420 for attorney fees and costs incurred in proving facts defendant did not admit in response to plaintiffs' requests for admission during discovery. The trial court denied both motions.

Defendant timely appealed from the judgment, and plaintiffs timely cross-appealed from the denial of their postjudgment motions.

## DISCUSSION

### A. Defendant Has Forfeited His Challenge to Jury Selection

Defendant argues the trial court's method of jury selection violated statutes requiring random seating of prospective jurors for voir dire. Defendant forfeited this argument for failure to raise it below.

#### 1. Additional Background

##### a. Start of jury selection

Before the prospective jurors were brought into the courtroom for the first time, the trial court stated, "I've got 75 [prospective jurors]. I'm not going to go by the numbers [when seating prospective jurors in the jury box for voir dire]. . . . I try to ask for volunteers because if I get volunteers, I know that they're going to be ready to serve for 30 days as opposed to calling

them one at a time according to the numbers." Neither party objected.

Plaintiffs' counsel noted the prospective jurors had been prequalified to serve for 30 days, and asked if the court would consider hardships. The court answered, "I try to be emphatic to the panel, that if you have the hardship, why are you telling me now? I mean, when you were asked by the jury commissioner, can you serve for 30 days, and you answered yes, and now you [say you cannot serve]. [¶] I don't think that makes sense to me." "[T]o give them an opportunity to state their hardship, I don't think that will be necessary. [¶] You tell me." Neither party had any comment.

Later, the prospective jurors entered the courtroom and were sworn in. Speaking to the 18 prospective jurors sitting in the jury box, the court stated, "[I]f you want your chair or your seat, you just volunteer, you've got it." After reading aloud a statement of the case setting forth the allegations and briefly explaining the voir dire process, the court stated, "Now, I am going to ask the folks who are now seated in the jury box, if you like where you are seated now, I will keep you there. And in other words, are you volunteering now to serve as prospective jurors in this case, or I can get the lawyers to start asking you questions?"[1] The court explained that if there were no volunteers, the judicial assistant would assign jurors to the box

---

[1] Given how voir dire proceeded from this point, with the parties' counsel questioning the prospective jurors sitting in the jury box, we suspect there is a misstatement or mistranscription here, and the trial court actually stated or meant to state, "[A]re you volunteering now to serve as prospective jurors in this case, *and* I can get the lawyers to start asking you questions?"

off the juror list. The court stated, "But I think it's faster and I like it much better, as a matter of fact, if I have volunteers because I know that you really like to have this case. [¶] I have top-notch lawyers in this case. It is going to be a very interesting case."

Following this explanation, some prospective jurors exited the jury box and returned to the gallery, and others remained. The court asked for additional volunteers from the prospective jurors in the gallery, who filled the now vacated seats in the jury box. With the jury box full, the trial court proceeded to ask the prospective jurors biographical information, which lasted until the lunch recess.

### b.　Trial court addresses juror hardships

Following lunch, and out of the presence of the prospective jurors, the court and parties further discussed how to address juror hardships. It appears the discussion began off the record, because the transcript of the discussion begins with defense counsel stating, "I think we should do it the normal way. Plaintiffs' counsel and I agree on this, where we ask about hardships, because that's in accord with the random selection system. [¶] You know, I agree I think we should do it the normal way, where we ask each juror about hardships. I know it takes longer, but I think it's a fairer system because it binds in with what would be random selection." Plaintiffs' counsel stated, "I'm fine with that, Your Honor."

The court responded, "I don't have time to argue with [jurors seeking hardship excusals]. I'm just going to excuse them all because they're going to ask to be excused in the first place." The court continued, "I'm going to excuse all these people who think they have a hardship because there's no point in talking to

6

them.  [¶]  If they want to be excused because they have other commitments, I can force them, but you don't like those kind of jurors . . . being forced to serve."

Plaintiffs' counsel stated that in his experience, people sometimes claimed hardships that were not in fact hardships, "[a]nd once they are able to vocalize and understand that's not a hardship, then they're more willing to serve.  [¶]  My experience is, once the process gets going . . . . the jurors that are on enjoy the process."  Plaintiffs' counsel believed defense counsel wished to give prospective jurors the opportunity to state their purported hardships so the parties and court could explain what was and was not a hardship, and that some prospective jurors would have to remain despite a claimed hardship.  Defense counsel agreed this is what the defense was requesting.

The court then called the prospective jurors back into the courtroom and voir dire continued with the parties giving "mini opening" statements and plaintiffs' counsel questioning the prospective jurors.

At the end of the day, the court and the parties heard from each prospective juror claiming a hardship.  The court denied some hardship excusal requests and granted others, sometimes rescheduling the prospective juror for a later service date.  The next morning, the court heard two more hardship requests, excusing one prospective juror and rescheduling the other.

### c.    The parties select the jury

Voir dire continued with both parties questioning the prospective jurors in the jury box.  The court then excused four of the jurors for cause, two at plaintiffs' request and two at defendant's request.  The court filled the four vacant seats with volunteers from the gallery.  Following further questions from

7

counsel, the parties exercised peremptory strikes, dismissing six prospective jurors from the jury box.  There were no further volunteers, so the court directed the clerk to fill the empty seats in the order each remaining prospective juror was listed on the jury list.  This nonvolunteer method of filling empty seats continued for the remainder of voir dire as prospective jurors were dismissed, whether for cause, a peremptory strike, or some other reason.

The final jury selected by the parties consisted of a mix of those who had volunteered to sit in the jury box for voir dire and those who had been called off the list.

### d. Defense challenges jury selection in motion for new trial

Following the verdict in plaintiffs' favor, defendant filed a motion for a new trial contending, inter alia, that the trial court erred "by asking for volunteer jurors," and thus the "case was not tried by a randomly selected jury as required by California law." Defendant claimed his counsel timely objected to the "use of volunteer jurors" by requesting during jury selection that the court address juror hardships "the normal way" "because that's in accord with the random selection system."

In denying the new trial motion, the trial court found defendant's "normal way" request concerned juror hardships, not the method by which the trial court filled the jury box for voir dire.  Therefore defendant had not timely objected to the use of volunteers to fill the jury box.  The court further found defendant had failed to show prejudice, and specifically had not shown that the court's volunteer method deprived him of an impartial jury or a jury "drawn from a representative cross-section of the community."

## 2. Analysis

"It is the policy of the State of California that all persons selected for jury service shall be selected at random from the population of the area served by the court." (Code Civ. Proc.,[2] § 191; see *People v. Visciotti* (1992) 2 Cal.4th 1, 37 (*Visciotti*) ["the Legislature has made it clear that random selection is a firm policy of the State of California"].) "Random selection shall be utilized in creating master and qualified juror lists, commencing with selection from source lists, and continuing through selection of prospective jurors for voir dire." (§ 198, subd. (a).)

Section 222 governs seating of jurors for voir dire. It provides, "[W]hen an action is called for trial by jury, the clerk shall randomly select the names of the jurors for voir dire, until the jury is selected or the panel is exhausted." (§ 222, subd. (a).) There is a different procedure "[w]hen the jury commissioner has provided the court with a listing of the trial jury panel in random order" — in that event, "the court shall seat prospective jurors for voir dire in the order provided by the panel list." (*Id.*, subd. (b).) Defendant argues the trial court violated the random selection statutes by allowing prospective jurors to volunteer for voir dire, rather than have them seated randomly as required under section 222.

Defendant did not object to the method by which the trial court seated jurors for voir dire, and has thus forfeited his challenge on appeal. In *Visciotti*, a death penalty appeal, our Supreme Court held, "While the parties are not free to waive, and the court is not free to forego, compliance with the statutory

_____

[2] Unspecified statutory citations are to the Code of Civil Procedure.

9

procedures which are designed to further the policy of random selection, equally important policies mandate that criminal convictions not be overturned on the basis of irregularities in jury selection to which the defendant did not object or in which he has acquiesced. [Citations.] The failure to object will therefore . . . constitute a waiver of a claim of error on appeal." (*Visciotti, supra*, 2 Cal.4th at p. 38; accord, *People v. Eubanks* (2011) 53 Cal.4th 110, 126.) Defendant cites no authority suggesting this rule does not apply equally in the civil context, nor have we found any.

Defendant argues his counsel's request that the trial court address hardships "the normal way" preserved his challenge to the court's system of seating jurors for voir dire. Defendant notes his counsel, in making that request, referred to "the random selection system," and that "ask[ing] each juror about hardships" is "a fairer system because it binds in with what would be random selection." Defendant contends, "Although defense counsel referenced juror hardships, his objection was directed at the court's jury selection process as a whole."

We cannot accept this characterization of defendant's objection. The discussion of random selection was limited to the issue of juror hardships — no mention was made of the court's acceptance of volunteers to fill the jury box for voir dire, neither during the hardship discussion or at any other time. The trial court obliged defense counsel's request by asking jurors individually about their hardships — the so-called "normal way" — thus providing all defense counsel had asked for. Despite many opportunities to object to the court's method of selecting prospective jurors to sit in the jury box, defense counsel did not do so.

Defendant argues the trial court's deviation from the random selection process constituted "structural error," which he contends excuses any failure to object below. We disagree. The forfeiture rule was first applied in *People v. Johnson* (1894) 104 Cal. 418, in which the courtroom bailiff selected 12 persons to be seated in the jury box, the persons were "sworn to answer as to their qualifications," and then they were "accepted and sworn as jurors." (*Id.* at p. 419.) The Supreme Court stated, "This mode of impaneling a jury differs materially from that prescribed in the statutes of the state, and if it had been done against the objection of defendant it would have constituted sufficient reason for reversal. But no objection was raised." (*Ibid.*) The defendant argued, "[T]he irregularity is one that could not be waived." (*Ibid.*) The Supreme Court disagreed, stating, "The jurors were taken from those who had been regularly drawn and summoned, but not in the prescribed order. It is plainly but an irregularity, and was waived by failing to object." (*Ibid.*)

The Supreme Court expressly affirmed *Johnson* and its forfeiture rule in *Visciotti*. (*Visciotti, supra*, 2 Cal.4th at p. 38 ["We have not had occasion . . . to consider whether the establishment of random selection as a policy of the state affects the rule applied in *Johnson*. We conclude that it does not."].)

*Johnson* is comparable to the instant case. As explained by our Supreme Court in a later opinion, the error in *Johnson* was that "the draw was not random," but rather "subject to the biases, both conscious and unconscious, of the person making the selections," in that case, the bailiff. (*People v. Wright* (1990) 52 Cal.3d 367, 395, disapproved of on other grounds by *People v. Williams* (2010) 49 Cal.4th 405.) Here, similarly, some prospective jurors selected themselves for voir dire, which

11

arguably could have injected bias into the selection process (an issue we do not decide). Assuming arguendo some errors in jury selection are so egregious that they cannot be forfeited for failure to object, the "irregularity" in the instant case is not so different in kind or dimension from that in *Johnson* to justify such an exception.

Defendant urges us to exercise our discretion to excuse forfeiture because his challenge presents "a pure legal question based on undisputed facts and of exceptional importance due to the lack of any published California authority explaining that screening for volunteers to serve on a jury is error." We decline to do so. The forfeiture rule is especially important with jury selection irregularities, because without it, parties could deliberately sit on their rights and save their jury challenge in case of an unfavorable verdict.

## B. Conditioning Settlement on Defendant's Insurer's Consent Did Not Invalidate Plaintiffs' Section 998 Offer

Plaintiffs contend the trial court erred in finding their section 998 settlement offer invalid because it required defendant's insurer's consent. We agree.

### 1. Additional Background

When plaintiffs offered in writing to settle the case for $749,999.99, their offer stated, "This offer is conditional upon [defendant's] insurance carrier consenting to [defendant's] acceptance of this offer."

After plaintiffs prevailed at trial, they moved for prejudgment interest under section 998 and Civil Code section 3291. Defendant opposed the motion, arguing the

settlement offer was invalid because it was conditioned on consent by defendant's insurer. Defendant further argued the settlement amount was unreasonable based on the information available to him at the time it was made. In particular, defendant argued at the time plaintiffs made the offer, Mr. Matthews' medical records and defendant's medical expert both indicated Mr. Matthews' injuries were resolved and/or minor and therefore, plaintiffs were unlikely to recover significant monetary damages.

The trial court denied plaintiffs' motion. It found the settlement offer invalid under section 998 because it was conditioned on acceptance by the insurer. The court did not reach defendant's additional argument that the offer was unreasonable.

### 2.     Analysis

Section 998 serves " 'to encourage the settlement of lawsuits prior to trial.' [Citation.]" (*Westamerica Bank v. MBG Industries, Inc.* (2007) 158 Cal.App.4th 109, 129.) It does so "by 'establish[ing] a procedure for shifting the costs upon a party's refusal to settle.' [Citation.]" (*Finlan v. Chase* (2021) 68 Cal.App.5th 934, 940.) Should a defendant refuse a plaintiff's section 998 offer, and thereafter, fail to obtain a more favorable judgment at trial, the trial court has discretion to require the defendant to pay the plaintiff's postoffer costs, including expert witness costs. (§ 998, subd. (d); *Finlan*, at p. 940.) In a personal injury action, the plaintiff may additionally recover prejudgment interest calculated from the date of the section 998 offer. (Civ. Code, § 3291.)

Decisions by appellate courts have contained language stating for a settlement offer to be valid under section 998, it "must be unconditional." (*Gorobets v. Jaguar Land Rover North*

13

*America, LLC* (2024) 105 Cal.App.5th 913, 926, review granted Jan. 15, 2025, S287946.) As we discuss *post*, this is somewhat an overstatement. We review a "challenge to the conditional nature of [an] offer to compromise de novo." (*Toste v. CalPortland Construction* (2016) 245 Cal.App.4th 362, 373, fn. 6 (*Toste*).)

In fact, appellate courts have held offers valid despite inclusion of certain conditions. In *Deocampo v. Ahn* (2002) 101 Cal.App.4th 758, the plaintiffs offered a settlement of the limit of the defendant's insurance policy, or $1 million, whichever was greater. (*Id.* at p. 776.) The offer reserved the plaintiffs' right to "vacate this offer or judgment" if the plaintiffs discovered that the defendant had more insurance than previously disclosed, in effect, conditioning the offer on the truth of the defendant's discovery responses regarding insurance coverage. (*Ibid.*) The Court of Appeal held that offer was valid under section 998, because the offer "simply sought to hold [the defendant] to his discovery representation that he only had $1 million in insurance coverage for plaintiffs' claims. Certainly litigants have a right to condition an offer to compromise on the accuracy of the information supplied by the offeree in discovery." (*Deocampo*, at p. 778; accord, *Markow v. Rosner* (2016) 3 Cal.App.5th 1027, 1054 ["Plaintiffs' section 998 offer was not invalid merely because it was conditioned on the accuracy of [the defendant's] disclosures regarding his insurance coverage for plaintiffs' claims"].)

In *Toste*, a defendant in a wrongful death lawsuit offered to settle the matter for $15,000, with the plaintiff "responsible for all medical expenses/liens." (*Supra*, 245 Cal.App.4th at p. 374.) The Court of Appeal deemed this latter provision "nothing more than a reminder of [the plaintiff's] obligation to pay the medical

expenses and liens," and thus the offer was not an invalid conditional offer. (*Ibid.*)

A valid section 998 offer may also condition settlement on "a dismissal with prejudice or the execution of a release" of the claims in the litigation. (*Menges v. Department of Transportation* (2020) 59 Cal.App.5th 13, 26 (*Menges*).)

In contrast, courts have held offers invalid under section 998 when they include nonmonetary conditions that make it difficult to compare the value of the offer to the value of the judgment ultimately rendered. (See *Menges*, *supra*, 59 Cal.App.5th at p. 26 ["The inclusion of nonmonetary terms and conditions does not render a section 998 offer invalid; but those terms or conditions must be sufficiently certain and capable of valuation to allow the court to determine whether the judgment is more favorable than the offer."].)

For example, an offer conditioned on a promise of indemnity against third party claims, or a release of claims outside the scope of the litigation, is invalid under section 998 because it is " 'difficult to accurately value the monetary term of the offer . . . .' [Citations.]" (*Toste, supra*, 245 Cal.App.4th at p. 373, fn. 6.) Similarly, "the task of valuing a confidentiality clause attached to a settlement offer in a defamation action is too subjective and, therefore, cannot be done. Thus, a confidentiality condition in such a settlement offer will render the offer invalid for purposes of shifting costs to the plaintiff." (*Barella v. Exchange Bank* (2000) 84 Cal.App.4th 793, 803.)

Courts have also held offers invalid under section 998 when the offers are conditioned on acceptance by multiple parties to the litigation. (*Menees v. Andrews* (2004) 122 Cal.App.4th 1540, 1544 ["It has long been held that a section 998 offer is effective to shift

15

liability for costs only where the offer was properly allocated as to multiple offerees and was made in a manner allowing individual offerees to accept or reject it"].)  In *Meissner v. Paulson* (1989) 212 Cal.App.3d 785, the defendants made a joint offer to the two plaintiffs.  (*Id.* at p. 790.)  The Court of Appeal held this offer, which "inherently necessitated agreement between the parties as to apportionment between them," was invalid under section 998. (*Meissner*, at p. 791.)  "[P]ermitting such application of section 998 would introduce great uncertainty into this area of the law. Plaintiffs would be required to second-guess all joint offers to determine whether a failure to reach agreement with coplaintiffs would cause a risk of section 998 costs against them."  (*Meissner*, at p. 791.)  To avoid this, the court held that "only an offer made to a single plaintiff, without need for allocation or acceptance by other plaintiffs, qualifies as a valid offer under section 998." (*Meissner*, at p. 791.)

Even when an offer specifically allocates portions of the offer to different parties, but nonetheless conditions the offer on acceptance by all parties, courts have held the offer invalid under section 998.  This is because "even though all [parties] be unwilling to accept the individual settlement offers made them, it is in the public interest that each be given the opportunity to accept and consummate the offer made him."  (*Hutchins v. Waters* (1975) 51 Cal.App.3d 69, 73; accord, *Wickware v. Tanner* (1997) 53 Cal.App.4th 570, 577.)

A contrary rule would promote gamesmanship:  " '[A] defendant facing multiple plaintiffs would merely have to offer all but one of them reasonable settlements and make the remaining plaintiff an unacceptable offer.  By conditioning acceptance of the judgment on the plaintiffs' unanimous agreement, a defendant

could insure that at least one of the plaintiffs would refuse. This refusal would subject all of them, including those who were willing to accept the offer of judgment, to the rule's penalty provision.' " (*Vick v. DaCorsi* (2003) 110 Cal.App.4th 206, 211–212.) Even if such gamesmanship is not at issue, "an offer which provides it must be accepted by all plaintiffs is fundamentally unfair to the plaintiff who believes the offer is reasonable as to her and wants to accept it. Such a conditional offer frustrates the chances of settlement, which is the whole purpose behind section 998." (*Vick*, at p. 211.)

The trial court in the instant case cited the prohibition on offers to multiple parties when denying plaintiffs' motion for prejudgment interest. Because plaintiffs' "offer was conditioned on acceptance by [defendant's] insurance carrier," the court concluded defendant "could not merely accept the offer and have judgment entered," which rendered the offer invalid under section 998. On appeal, defendant similarly argues an offer conditioned on acceptance by a party's insurer is analogous to an offer conditioned on acceptance by multiple parties to the lawsuit.

We reject this analogy. As defendant acknowledges, "[A] defending insurer cannot be bound to a settlement to which it has not agreed and in which it has not participated . . . ." (*Hamilton v. Maryland Casualty Co.* (2002) 27 Cal.4th 718, 722.) Implicit in any settlement offer to a party defended by an insurer, therefore, is a requirement of insurer consent, because without that consent there is no settlement. Plaintiffs' "condition" was nothing more than an express, and redundant, recognition of that implicit requirement. Put another way, defendant's insurer's consent was required whether or not plaintiffs expressly said so in their offer.

17

Defendant argues, "[A]n insured is legally capable of accepting a settlement offer without his insurer's consent." This is so as far as it goes, but people buy insurance so they do *not* have to personally pay a covered liability. The expectation is that the carrier will pay the settlement and plaintiffs make offers based on that expectation.

Defendant argues, "[A] condition requiring acceptance by a nonparty, such as an insurer, introduces uncertainty and undermines the purpose of section 998 by making the offer contingent on factors outside the control of the offeree." Given the necessity of an insurer's participation in the insured's settlement process, we do not see how a settlement condition recognizing that fact undermines settlement.

Defendant argues conditioning a settlement on insurer consent "goes beyond what is permitted by section 998," which contemplates that the offeree be a party to the action. (See § 998, subd. (b) ["any party may serve an offer in writing upon any other party to the action"].) Requiring that the offer be made to a party rather than the party's insurer does not change the fact that whether or not the settlement offer expressly so states, as a practical matter there will be no settlement without insurer consent.

Having erroneously found the section 998 offer invalid because of the condition of insurer consent, the trial court did not reach the question of whether the offer was in good faith and reasonable. Normally, "[t]he decision whether a section 998 offer was reasonable and in good faith lies within the discretion of the trial court." (*Calvo Fisher & Jacob LLP v. Lujan* (2015) 234 Cal.App.4th 608, 629 (*Calvo*).) Plaintiffs argue, however, their offer was in good faith as a matter of law, and therefore it is

18

unnecessary to remand the matter to the trial court for a good faith/reasonableness determination.

We disagree. "A 998 offer is made in good faith only if the offer is ' "realistically reasonable under the circumstances of the particular case" ' [citation] — that is, if the offer ' "carr[ies] with it some reasonable prospect of acceptance" ' [citation]." (*Licudine v. Cedars-Sinai Medical Center* (2019) 30 Cal.App.5th 918, 924 (*Licudine*).)

"Whether a section 998 offer has a reasonable prospect of acceptance is a function of two considerations, both to be evaluated in light of the circumstances ' "at the time of the offer" ' and ' "not by virtue of hindsight." ' [Citations.]" (*Licudine, supra,* 30 Cal.App.5th at p. 924.) "First, was the 998 offer within the 'range of reasonably possible results' at trial, considering all of the information the offeror knew or reasonably should have known? [Citation.] Second, did the offeror know that the offeree had sufficient information, based on what the offeree knew or reasonably should have known, to assess whether the 'offer [was] a reasonable one,' such that the offeree had a 'fair opportunity to intelligently evaluate the offer'? [Citations.] These two considerations assess whether the offeror knew that the 998 offer was reasonable, first, from the offeror's perspective and, second, from the offeree's perspective." (*Licudine,* at pp. 924–925.)

As plaintiffs correctly note, the fact that the verdict in their favor was higher than their settlement offer " 'constitutes prima facie evidence showing the offer was reasonable.' [Citation.]" (*Calvo, supra,* 234 Cal.App.4th at p. 629.) This does not end the reasonableness inquiry because the trial court still must determine whether the offeree had sufficient information at the time of the offer to evaluate it. Although plaintiffs point to

19

evidence purportedly available to defendant at the time of the offer indicating a possibility of a jury award far in excess of the settlement offer, evaluating that evidence is the province of the trial court, which should do so in the first instance. We thus remand for the trial court to determine whether plaintiffs' settlement offer was reasonable and in good faith.[3]

## C. There Is No Basis To Reverse the Denial of Plaintiffs' Motion for Costs of Proof

Plaintiffs contend the trial court erred in denying their motion for costs of proof because 1) the court relied on evidence that was not available to defendant at the time he denied the relevant requests for admission (RFA) and 2) the court did not analyze each RFA response individually. Plaintiffs have forfeited their first contention for failure to raise it below. The second contention fails on the merits.

---

[3] Plaintiffs cite *Miller v. Elite Ins. Co.* (1980) 100 Cal.App.3d 739 and *Samson v. Transamerica Ins. Co.* (1981) 30 Cal.3d 220 as examples of courts finding settlement offers reasonable as a matter of law. Those cases did not concern whether offers were reasonable for purposes of section 998. Rather, they concerned whether insurance companies were liable to their insureds for wrongfully denying reasonable settlement offers. (*Miller*, at pp. 756–757; *Samson*, at p. 243.) Plaintiffs make no argument and cite no authority that the reasonableness inquiry in *Miller* and *Samson* is analogous to, or instructive on, the reasonableness inquiry under section 998. We therefore do not address those cases further.

### 1. Governing law

Under section 2033.420, "If a party fails to admit the genuineness of any document or the truth of any matter when requested to do so . . . , and if the party requesting that admission thereafter proves the genuineness of that document or the truth of that matter, the party requesting the admission may move the court for an order requiring the party to whom the request was directed to pay the reasonable expenses incurred in making that proof, including reasonable attorney's fees." (§ 2033.420, subd. (a).)

The court "shall make this order" unless it finds any of the following: "(1) An objection to the request was sustained or a response to it was waived . . . . [¶] (2) The admission sought was of no substantial importance. [¶] (3) The party failing to make the admission had reasonable ground to believe that that party would prevail on the matter. [¶] (4) There was other good reason for the failure to admit." (§ 2033.420, subd. (b).)

Denial of a section 2033.420 motion is reviewed for abuse of discretion. (*Association for Los Angeles Deputy Sheriffs v. Macias* (2021) 63 Cal.App.5th 1007, 1024 (*Macias*).)

### 2. Additional background

After prevailing at trial, plaintiffs filed a motion under section 2033.420 for attorney fees and costs incurred in proving facts defendant failed to admit in response to RFAs served during discovery. Plaintiffs identified 27 RFAs for which they contended they were entitled to fees and costs. In summary, those RFAs asked defendant to admit that his negligence was the sole cause of the accident, Mr. Matthews suffered specified injuries and anxiety as a result of the accident, Mr. Matthews had no

21

preexisting injuries prior to the accident, and Mrs. Matthews suffered loss of consortium because of the accident.  Defendant responded to the 27 RFAs either by denying them or claiming he could not admit or deny them after making a reasonable inquiry.[4]

In their motion, plaintiffs argued defendant had no reasonable basis to believe he would prevail on the issues raised by the RFAs.  Plaintiffs contended that defendant's prelitigation accident reconstruction expert, Russell Gish, concluded defendant was at fault, and Mr. Matthews' medical records and the report of defendant's own medical expert, Ronald Kvitne, demonstrated the nature and severity of Mr. Matthews' injuries.

Defendant opposed the motion, arguing he had a reasonable basis to believe he was not at fault for the accident.  He contended the police report indicated Mr. Matthews caused the collision, and the evidence showed the majority of debris was in his lane of travel.  He further argued Gish was retained by his insurer, not by defendant and his counsel, and Gish's conclusions were undercut by two subsequent accident reconstruction experts retained by defendant.  Defendant also claimed two jurors indicated posttrial that they "strongly believed Defendant was not at fault for the collision."

As for the issue of damages, defendant argued his medical expert Kvitne initially concluded Mr. Matthews' injuries were minor and had resolved, and therefore defendant did not admit the RFAs concerning injuries.  It was not until later in the

---

[4] In addition to denying RFA No. 16, that Mr. Matthews was obeying all traffic laws immediately prior to the collision, defendant objected that the request was "Overly broad; limitation of time."  On appeal, plaintiffs do not challenge the trial court's denial of costs of proof as to RFA No. 16.

litigation, after defendant had already responded to the RFAs, that his expert changed his opinion and concluded Mr. Matthews' injuries were more serious.

In reply, plaintiffs argued that whatever uncertainty jurors might have had during trial, ultimately they unanimously returned a verdict finding defendant 100% at fault, and therefore any posttrial statements by jurors did not establish defendant was reasonable to deny liability. They further argued the verdict in plaintiffs' favor demonstrated the jury did not find defendant's two additional accident reconstruction experts credible. Thus, defendant could not now argue those experts' opinions provided a reasonable basis to deny liability when the first expert defendant's insurer hired found defendant was at fault.

Plaintiffs contended the police report provided no basis to deny liability because the police officer who drafted it testified in deposition he had no opinion as to the cause of the crash, and that he was not an expert in accident reconstruction. They also disputed defendant's claim that most of the debris was in his lane of travel. They contended the accident photographs showed most of the debris was in the center of the road, and defendant's vehicle came to rest on the wrong side of the road.

Plaintiffs argued Kvitne's initial opinion that Mr. Matthews would recover well from his injuries did not provide a reasonable basis to deny the RFAs because Kvitne acknowledged Mr. Matthews had suffered a shoulder fracture and Mr. Matthews' medical records established his other injuries. Plaintiffs contended that evidence also was enough to establish Mrs. Matthews "would suffer loss of consortium for at least some period of time."

23

In advance of the hearing on the motion, the trial court posted a tentative ruling on its website denying the motion. The court found defendant's additional accident reconstruction experts provided a reasonable basis for defendant to reject the opinion of his insurer's expert and to deny liability, even if those experts did not persuade the jury. Although the police officer who drafted the accident report testified he was not a trained in accident reconstruction and had no opinion as to the cause of the crash, the trial court found the officer's report and testimony nonetheless provided evidence favorable to defendant. The jurors' posttrial statements indicated "the issue [of liability] was not necessarily obvious to the jurors despite the unanimous decision." The court stated, "Plaintiffs' arguments here ultimately go to the merits of their case, not whether Defendant reasonably entertained a good faith belief of prevailing at trial."

As to damages, the trial court noted Kvitne's initial report opined that Mr. Matthews' injuries were "minor," consisting of a shoulder fracture, right hand abrasion, and a mild cervical strain, and Mr. Matthews would recover from his pain after 12 weeks of physical therapy without need for future surgery. Based on that report, which was what defendant had available to him at the time he responded to the RFAs, the court found it was reasonable for defendant to believe "Plaintiff's injuries were only minor." The court found that report also provided a reasonable basis for defendant not to admit the RFAs concerning Mrs. Matthews' loss of consortium.

The parties addressed the tentative ruling at the hearing. Plaintiffs' counsel argued defendant could not reasonably believe he would prevail at trial when his insurer's expert concluded he was at fault for the accident and his subsequent experts were the

product of "expert shopping" rather than a proper evaluation of the evidence. Counsel further argued the jury's rejection of the subsequent experts indicated those experts' opinions were not valid. Counsel did not address damages apart from suggesting that whatever defendant's medical expert said, the defense was "trying to find the expert that would support [the defense's] positions rather than listening to the experts" and "looking at the evidence."

The trial court took the matter under submission, after which it adopted its tentative ruling denying plaintiffs' motion as its final order.

### 3. Analysis

Plaintiffs argue the trial court applied the wrong legal standards when evaluating their section 2033.420 motion, and request we remand for the trial court to apply the correct standards. (See *In re S.G.* (2021) 71 Cal.App.5th 654, 673 [" ' "a discretionary order based on an application of improper criteria or incorrect legal assumptions is not an exercise of informed discretion and is subject to reversal" ' "].)

First, plaintiffs contend the trial court erred by considering evidence acquired *after* defendant refused to admit the RFAs to determine if defendant's refusal was reasonable. Plaintiffs argue the trial court should have limited its review to the evidence available to defendant at the time he refused to admit the RFAs. According to plaintiffs, this would exclude the opinions of defendant's additional accident reconstruction experts and the jurors' posttrial statements.

Plaintiffs forfeit this claim of error for failure to raise it below. (*GoTek Energy, Inc. v. SoCal IP Law Group, LLP* (2016) 3 Cal.App.5th 1240, 1248 [issue forfeited if not raised in trial

25

court].) Plaintiffs never objected to the evidence proffered by defendant in opposing their section 2033.420 motion, nor did they object to the trial court's reliance on that evidence in its tentative ruling.

Plaintiffs contend their argument below that defendant "could not 'claim [his] position was reasonable just because he was able to hire two experts to say he was not at-fault' " "encompasses the principle that later-acquired information is not relevant to the costs-of-proof analysis." We disagree. The full context of that statement, from plaintiffs' reply in support of their section 2033.420 motion, is the following: "Here, Defendant knew he was responsible. Despite having two experts testifying he was not at-fault, the jury still unanimously found Defendant 100% liable. This, on its own, is evidence that Defendant's experts were taking unreasonable and unbelievable positions. Accordingly, Defendant cannot claim its position was reasonable just because he was able to hire two experts to say he was not at-fault."

Nothing in the above-quoted statement would suggest to the trial court plaintiffs were objecting to the evidence because of when it was acquired. Rather, plaintiffs were arguing the jury's rejection of the experts' opinions demonstrated those opinions were "unreasonable and unbelievable" and therefore could not justify defendant's belief that he would prevail at trial.

Plaintiffs further argue their challenge to "the information relied on by the trial court" can only be addressed on appeal, presumably because plaintiffs could not know the basis of the trial court's ruling until the ruling was issued. Au contraire. Plaintiffs had the opportunity to object to the evidence when defendant proffered it in his opposition, and had further

26

opportunity to object at the hearing after the trial court issued its tentative ruling. They cannot now contend this appeal was their first opportunity to challenge the evidence.

Plaintiffs second claim of error is that the trial court "failed to analyze the causation and damages RFAs individually, instead coming to the sweeping conclusion that [defendant] could have 'reasonably entertained a good faith belief that [Mr. Matthews'] injuries were only minor . . . .'" Plaintiffs argue, "[T]he RFAs addressing damages did not seek admissions characterizing the nature of [Mr. Matthews'] injuries or whether they were 'only minor.' [Citation.] Rather, they sought admission of specific factual information regarding [Mr. Matthews'] injuries and [Mrs. Matthews'] loss of consortium, and could have been true even if [Mr. Matthews'] injuries were 'only minor,' which they were not."[5]

We find no error or abuse of discretion in the trial court's conclusion that the medical expert's opinion that Mr. Matthews' injuries were temporary and could be resolved without additional surgery provided a reasonable basis for defendant to decline to admit the RFAs concerning Mrs. Matthews' claims of loss of consortium.[6] Although plaintiffs argue even minor injuries

---

[5] Plaintiffs did not object to the trial court's tentative ruling as insufficiently specific, and indeed hardly addressed the issue of plaintiffs' injuries and loss of consortium at the section 2033.420 hearing at all. Defendant does not argue forfeiture, however, and we assume arguendo plaintiffs may raise their challenge on appeal.

[6] Defendant did not deny the RFAs concerning loss of consortium, but responded that following a reasonable inquiry, he could neither admit nor deny them.

27

might lead to loss of consortium, we agree with the trial court that it would have been reasonable for defendant to conclude a jury was unlikely to award loss-of-consortium damages for what defendant's expert opined were minor, temporary injuries. The expert's opinion also provided a reasonable basis to deny the RFAs concerning lifetime pain and need for future medical care.

The remainder of the RFAs defendant did not admit concerned specific injuries or symptoms suffered by Mr. Matthews, specifically tenosynovitis in the bicep, "weakness," "stiffness," "scarring," "anxiety," and arm pain, as well as Mr. Matthews' lack of preexisting injuries. Plaintiffs are correct the RFAs did not address the *seriousness* of those injuries — that is, whether the injuries were minor or not — but rather, whether Mr. Matthews sustained those injuries at all. We agree with plaintiffs, therefore, that to the extent Kvitne opined Mr. Matthews' injuries were minor, that opinion on its own would not justify declining to admit the injuries occurred.

We do not think, however, the trial court would have, or indeed could have, reached a different conclusion had it been expressly granular in its analysis. Kvitne's report identified numerous injuries suffered by Mr. Matthews, and defendant admitted all RFAs concerning those identified injuries, including that Mr. Matthews suffered a shoulder fracture that caused him pain and required surgery. Defendant declined to admit only the RFAs concerning injuries Kvitne did *not* identify. In response to those RFAs, defendant stated he had conducted a reasonable investigation and determined he could neither admit nor deny those RFAs.

Defendant's response to the RFAs was appropriate. The discovery statutes allow a party to decline to admit an RFA if the

party lacks sufficient information to do so, so long as the party has conducted a reasonable inquiry. (§ 2033.220, subds. (b)(3), (c); *Macias*, *supra*, 63 Cal.App.5th at p. 1029 [party declining to admit RFA for lack of sufficient information has "a duty to make a reasonable investigation of the facts"].) Defendant's medical expert Kvitne's examination of Mr. Matthews and drafting of a detailed report constituted a reasonable investigation — plaintiffs do not argue or suggest Kvitne was unqualified or his analysis was deficient. Based on that investigation, defendant admitted to the injuries his expert listed in his report, and neither admitted nor denied the injuries his expert did not list. In other words, defendant admitted the injuries his reasonable investigation uncovered, and, for lack of sufficient information, declined to admit or deny the injuries the investigation did not uncover.

Plaintiffs argue Kvitne's determination that Mr. Matthews suffered certain injuries does not "disprove" that Mr. Matthews suffered the other injuries identified in the RFAs. Plaintiffs further assert to the extent defendant did not have enough information to admit or deny the RFAs based on Kvitne's report, he could have investigated further or objected that the RFAs concerned issues he could not reasonably verify. The discovery statutes require neither that defendant "disprove" the assertions in the RFAs before declining to admit them nor that he object to them. Again, the statutes allowed defendant to decline to admit or deny the RFAs for lack of sufficient information after his expert conducted a reasonable inquiry.

In sum, to the extent the trial court arguably should have been more specific in its analysis of the RFAs concerning Mr. Matthews' injuries, the court's ultimate determination that

29

plaintiffs were not entitled to costs of proof for those RFAs was not an abuse of discretion.

## DISPOSITION

The judgment and the order denying plaintiffs' motion under Code of Civil Procedure section 2033.420 are affirmed. The order denying plaintiffs' motion under Code of Civil Procedure section 998 and Civil Code section 3291 is reversed, and the matter is remanded for the trial court to determine whether plaintiffs' settlement offer was reasonable and in good faith. The parties shall bear their own costs on appeal.

<u>CERTIFIED FOR PARTIAL PUBLICATION.</u>

BENDIX, Acting P. J.

We concur:

WEINGART, J.

M. KIM, J.

30